**CLEVELAND HAIR CLINIC, INC., Plaintiff,**

v.

**Carlos J. PUIG, et al., Defendants.**

**No. 96 C 3560.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 22, 1996.

Alan S. Rutkoff, McDermott, Will & Emery, Chicago, IL, for plaintiff.

Thomas Brejcha and Juris Kins of Abramson & Fox, Chicago, IL, for Dr. Carlos Puig, pPuig Medical Group, S.C.

Thomas Ging of Hinshaw & Culbertson, Chicago, IL, for Dr. Rodney Haenschen.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This action by Cleveland Hair Clinic, Inc. ("Cleveland Hair") against Dr. Carlos Puig ("Puig") and Puig Medical Group, S.C. ("Puig Group") (those two defendants are collectively termed "Puig Defendants") and Dr. Rodney Haenschen ("Haenschen") has had an

extraordinarily active five-month life. There have been a surfeit of motions and two evidentiary hearings, and this Court has been compelled to issue several opinions of greater or lesser length. Now at issue is Cleveland Hair's motion for preliminary injunctive relief under Fed.R.Civ.P. ("Rule") 65, on which the three-day duration of the evidentiary hearing ("Hearing") belies its complexity (some thousands of pages of depositions as well as the numerous bulky exhibits have had to be considered along with the witnesses' in-court testimony).

After the Hearing each of the parties has submitted proposed findings of fact and conclusions of law, and those have been reviewed in detail in conjunction with the Hearing evidence. What follows are this Court's findings of fact ("Findings") and conclusions of law ("Conclusions") in accordance with Rules 52(a) and 65. To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

*Background Facts*

1. Cleveland Hair is a corporation organized under the laws of Ohio, where it also has its principal place of business (Leonhard Dep. 5–10). It is in the business of operating hair transplant facilities located in Rosemont, Illinois; Waltham, Massachusetts; Washington, D.C.; Union, New Jersey; and King of Prussia, Pennsylvania. At those facilities patients are counseled for, and frequently contract for and receive, hair transplant surgery, other surgical procedures and other forms of treatment with the objective of remedying baldness (collectively "hair transplant procedures") (Leonhard Dep. 17–19).

2. Puig is a Texas citizen (Puig Dep. 20). He is a doctor of osteopathic medicine who specializes in hair transplant procedures (*id.* 46, 51).

3. Puig Group is an Illinois corporation having its principal place of business in Illinois (Amended Complaint ¶ 3 and Answer ¶ 3). It is a professional service corporation

formed in about 1993 by Puig, its sole shareholder, to engage in the practice of medicine (Puig Dep. 64–65).

4. Haenschen is an Illinois citizen (Haenschen Dep. 4). Like Puig, he too is a doctor of osteopathic medicine who performs hair transplant procedures (*id.* 8, 11). He renders services to Puig Group under a written contract that characterizes him as an independent contractor (*id.* 31 and Ex. 2).

*Pre-Termination Relationships Among the Parties*

5. Puig and Haenschen began performing hair transplant procedures at Cleveland Hair facilities in the mid–1970s, shortly after each had completed his osteopathic training and Cleveland Hair started its business (Puig Dep. 51; Haenschen Dep. 10–11). At that time both Puig and Haenschen were in the military service, and both started working at Cleveland Hair on a part-time basis. Neither had any training or experience in performing hair transplant procedures, any office or equipment or any patients (Puig Dep. 46–51; Haenschen Dep. 7–11). Cleveland Hair's president arranged for a doctor to train Puig, and shortly thereafter Puig demonstrated the procedure for Haenschen (Puig Dep. 52–57, 147).

6. Those arrangements continued until late 1993 without any written agreement between Cleveland Hair on the one hand and Puig and other physicians on the other. Although the physicians were referred to collectively as the "Puig Medical Group," they were neither incorporated nor otherwise part of any formal entity.

7. During that pre–1993 period Puig became Cleveland Hair's Medical Director as well as a corporate director and shareholder. Puig's responsibilities included engaging other doctors who, like Puig and Haenschen, worked at Cleveland Hair's facilities as independent contractors.

8. On October 1, 1993 Cleveland Hair and the recently-incorporated Puig Group entered into a written agreement for the first time ("Agreement," App. Ex. 6 [1]). It provid-

---

1. "App. Ex.—" refers to documents submitted to

this Court as part of the Appendix to Cleveland

ed for a 10–year term ending September 30, 2003. During that term Puig Group has the exclusive right to perform hair transplant procedures at Cleveland Hair's facilities, while in turn Cleveland Hair has the right to manage the facilities at which Puig Group and its doctors perform all such procedures (with limited exceptions that not relevant to the current motion, such as a facility that Puig operates in Houston, Texas without Cleveland Hair).

9. Under the Agreement Cleveland Hair is required to lease, furnish and equip the facilities; to employ all of the persons who work at the facilities other than the doctors; and to perform all of the services necessary to manage and support the facilities, including marketing, advertising and promotion of the Puig Group doctors who work at the facilities. Thus Cleveland Hair and not Puig Group is the owner or lessee of the facilities operated by Cleveland Hair, is the employer of the individuals who work there and is obviously responsible to pay for those obligations and to carry out substantial other obligations without regard to the compensation it receives from Puig Group.

10. Puig and Cleveland Hair caused the Agreement to be drafted carefully to avoid "fee splitting": any sharing by Puig Group with Cleveland Hair, a corporation that is not permitted to and does not practice medicine, of fees that Puig Group receives for medical services (Puig Dep. 63). Thus Cleveland Hair's remuneration under the Agreement is based on compensation for the services that it renders and the expenses that it incurs, without regard to the number of patients or revenues that it generates for Puig Group or any other measure of its success.

11.[2] Without practicing medicine as such, Cleveland Hair employs nurses, surgical as-

sistants and consultants, all of whom play an integral role in the provision of hair transplant procedures rendered to patients at Cleveland Hair's facilities. Indeed, in 1990 Puig awarded Cleveland Hair's Rosemont manager, non-doctor Richard Malmin ("Malmin"), a certificate of merit to recognize his "steadfast devotion to high quality patient care" and for "enhancing hair replacement surgical technology" (CH Ex. 8).[3]

12. In the manner by which the conduct of the hair transplant business has been carried out by Cleveland Hair and Puig Group (an arrangement developed with Puig's active participation and guidance), the physician plays a very limited role aside from actually performing the physical hair transplant procedure. For instance, the physician typically does not meet the patient or see the patient's file until the day of the procedure (Puig Dep. 167, 187). Even then the Cleveland Hair consultant who was responsible for the patient's consultation remains heavily involved (Malmin Tr. 9/17/96;[4] Puig Dep. 182 ("When I'm talking to the patients, I encourage the managers to come in whenever I'm talking to a patient and designing their treatment plan")).

13. Cleveland Hair personnel schedule the hair transplant procedures and designate which Puig Group doctor is available on the day that the patient desires to have the procedure (Puig Dep. 162–67; Haenschen Dep. 161). No doctor participates in making those arrangements.

14. Although a typical hair transplant procedure lasts from 3 to 8 hours, the treating physician usually spends a very small part of that time during the entire procedure (some of the testimony placed it at about 25 minutes—and though the witnesses' versions

---

Hair's Proffer in Support of Its Motions for Sanctions, which has been treated as part of the record on the current motion.

2. What follows in Findings 11 through 20 is a description of how the Cleveland Hair–Puig Group relationship worked before the latter acted to terminate the relationship (as is dealt with later in these Findings). To avoid any awkwardness in locution, all of those Findings will employ the present tense.

3. Hearing exhibits will be referred to here as "CH Ex.—" for those bearing Cleveland Hair's markings, "PD Ex.—" for any bearing markings of Puig Defendants and "H Ex.—" for any bearing Haenschen's markings.

4. "Tr." refers to the record at the Hearing, in each instance preceded by the witness' name and followed by the date of the witness' testimony. Because no counsel has ordered the transcript written up, the Court has perforce relied on its detailed notes of the testimony at the Hearing.

varied somewhat, there is no question that the actual doctor-patient contact is quite brief). During the balance of the time Cleveland Hair personnel administer the anesthetics, perform the necessary procedures and work with the patient. Thus a physician is present at the facility, but he is not actually present in the operating room except during a small portion of the procedure (Malmin Tr. 9/17/96).

15. Both before and after the doctor's performance of his phase of the procedure, Cleveland Hair personnel also perform important and necessary functions such as obtaining patient medical information, applying and changing bandages, removing sutures, giving post-operative check-ups and shampoos, answering patient inquiries, dispensing pre-surgical instructions and remedying post-surgical problems (Puig Dep. 177–79, 201–05; see also App. Ex. 26; Puig Dep. 171–74; Haenschen Dep. 96–104). Cleveland Hair personnel are also responsible for maintenance of the patients' files and, in fact, make most of the notes and other entries contained in those files (App. Ex. 26; Puig Dep. 175–78; Malmin Dep. 174–75; Haenschen Tr. 9/19/96).

16. Cleveland Hair consultants also prepare proposed treatment plans for prospective patients. While the proposed plans prepared by those consultants are subject to review and approval by a doctor, they are almost always the final versions. In other words, Puig Group almost always concurs with the proposed plan prepared by the Cleveland Hair consultant (Puig Dep. 180–81).

17. Proposed treatment plans usually contemplate multiple procedures, but they do *not* provide that all procedures will be performed by the same doctor, and no commitment to that effect is made. In fact Cleveland Hair employees are authorized to schedule a patient's later procedures with doctors other than the one who performed the original procedure (Puig Dep. 168–69). As Finding 12 states, a patient generally has no contact with a doctor until the patient appears for the actual surgery, and only then is he asked to execute a consent form identifying the doctor who is to perform the procedure. Initial surgery dates are always scheduled for a date after the consultation and the preparation of the proposed plan by the Cleveland Hair consultant (Haenschen Dep. 169–70).

18. If a patient undergoes more than one procedure, the physician typically will not see the file from the date of the first procedure until the date that the next procedure is performed. Later procedures are not scheduled until some period of time has elapsed from the completion of the first procedure. In the intervening period all or substantially all patient contact, including all solicitations to schedule the next procedure, is with Cleveland Hair's personnel and not with the doctors (Puig Dep. 162–65, 167–68, 187).

19. Hair transplant procedures performed at Cleveland Hair's facilities are cosmetic surgeries and are not medically necessary. Hence the patients are generally persons who respond to advertisements directed at people who desire to have their appearance changed cosmetically. Thus for the entire period of the parties' relationship through late June 1996 the financial success of Puig Group's practice depended on the successful solicitation of patients and on the expenditure of substantial amounts for advertisements and for related promotional activities, all of which were performed by Cleveland Hair (Puig Dep. 106–07). Although the advertisements promoted Puig Group's practice, they also gave Cleveland Hair major prominence (CH Ex. 1).

20. Almost all of Puig Group's patients have been obtained by Cleveland Hair's efforts (or through referrals from past patients obtained through such efforts), and all Puig Group patients had their first contact with the Cleveland Hair consultant and not with a doctor (Puig Dep. 106–07).

21. Cleveland Hair invested substantial amounts in its relationship with Puig Group, and it reasonably relied on the expectancy that the relationship would continue through the stated term of the Agreement. For example, as of May 1996 [5] Cleveland Hair had

---

**5.** From here on all dates mentioned without any year designation refer to 1996 events.

expended substantial amounts to secure an accreditation that Puig wanted, and Cleveland Hair had recently completed fitting up a special operating room at its Rosemont facility so that Puig Group doctors could perform a hair transplant procedure called a "Brandy Flap," a specialized and complicated procedure (devised by a Dr. Brandy—hence the name) in which a patient's hair-bearing skin is stretched over portions of his bald area (Leonhard Dep. 194–99, 310–15). As Finding 39 reflects, Puig knew that Cleveland Hair had no contingency plans in effect to provide for the continuation of its business if Puig Group were to leave its association with Cleveland Hair.

22. Relatively few physicians (approximately 700) in the United States regularly perform hair transplant procedures. (Puig Dep. 102; Puig Sanction Tr. 36 [6]). Because of medical licensing requirements, Cleveland Hair cannot offer hair transplant procedures at its facilities unless it has contracted with qualified physicians who are licensed to perform them.

*Defendants' Preparation for Termination*

23. On May 24 Puig as Puig Group's President notified Cleveland Hair of the termination of the Agreement effective 30 days thereafter. Puig Group's termination notice ("Notice") purports to be given pursuant to an October 1, 1993 side letter of agreement ("Letter," App. Ex. 3) between Cleveland Hair and Puig Group, entered into at the same time as the Agreement, that addressed an unresolved issue involving malpractice liability insurance. According to the Letter either party had the right to terminate the agreement if at the end of a six-month negotiating period Cleveland Hair and Puig Group were unable to come to terms on the payment of a tail insurance policy.

24. One of this Court's November 20 memorandum opinions and orders (the "Summary Judgment Opinion") has ruled that the Notice was invalid and ineffective to terminate the Agreement, so that summary judgment has been granted in Cleveland Hair's favor on its Amended Complaint Count I. All

of the findings and determinations contained in the Summary Judgment Opinion apply here with equal force, and these Findings will not repeat the factual underpinnings of those determinations.

25. Puig actually decided to terminate Puig Group's relationship with Cleveland Hair many months before delivering the Notice (if not earlier), because Puig was dissatisfied with the existing relationship. Puig's plan was to have Puig Group perform the functions that Cleveland Hair had been performing, to take over Cleveland Hair's Rosemont facility "lock, stock, and barrel" and to drive Cleveland Hair out of business, at least in the Chicago area where most if not all of its profits were derived (Puig Dep. 95–96; Haenschen Dep. Ex. 8).

26. At least as early as in February Puig was already seeking financing for his venture described in Finding 25 (Puig Sanction Tr. 30–34; Flahaven Dep. 18, 19, 27, 42–55, 59–69, 70, 78–80). In a February letter to a potential lender, Puig Defendants' lawyer Stephen Schostok, the person who took the lead in securing financing, reported that "our client [Puig] and his medical group have determined to terminate the agreement ..." (Puig Doc. 70933). That as well as all of the other pre-termination activity dealt with in later Findings belies defendants' contention and Puig's testimony that the decision to terminate the relationship between Cleveland Hair and Puig Defendants was not made until shortly before the Notice was delivered in late May, as a result of an alleged incident of fee-splitting that had occurred in April.

27. One essential component of Puig Defendants' plan was to keep Cleveland Hair "in the dark" until the last possible moment. Cleveland Hair was given only 30 days' notice because that was all that the Agreement required (Puig Dep. 102). Although Puig Group would of course have been well within its rights if it had served a 30 day notice in implementation of a legitimate termination of the Agreement, under the circumstances that are set out in these Findings the notice peri-

---

**6.** Testimony from the multi-day sanctions hearing is referred to as "Sanction Tr.—," in each instance preceded by the witness' name. That testimony also forms part of the record on the current motion, with the limited exception referred to in Conclusion 2.

od that was chosen by Puig aggravated Cleveland Hair's injuries sustained by reason of defendants' improper conduct.

28. At least as early as in February Puig was furnishing banks with Cleveland Hair's financial statements, projections for the new venture and a document entitled "Assumptions Supporting PMG Chicago Cash Flow Projections" (App. Exs. 13, 14; Flahaven Dep. 23, 66). But Puig did not furnish any prospective lenders with Puig Group's own audited financial statements. Moreover, Puig took no steps to protect the secrecy of the Cleveland Hair financial information that he was using (Flahaven Dep. 62). All of the actions described both heretofore and hereafter leave no doubt that Puig Defendants' intention to sever their relationship with Cleveland Hair was formed well before Puig Group served Cleveland Hair with the termination Notice in late May.

29. According to Puig's own testimony (Dep.545–48) he began to solicit Haenschen, the linchpin of the Rosemont facility, to work at his new venture not later than in February.[7] Puig's "business assumptions" document that he was sending to potential lenders—a document that was in existence in early February and delivered to a bank shortly thereafter (App. Ex. 14, containing a fax identification that shows February transmission; Flahaven Dep. 18, 23–24)—includes a statement as to the need to pay substantial bonuses to Puig Group doctors "to assure that [they] do not jump to CHC" (App.Ex. 14). Puig credibly testified that he and Haenschen began discussing leaving Cleveland Hair for the new venture before Puig ever incorporated the assumption regarding "bonuses" in the document (Puig Dep. 545–48).

30. Haenschen and Puig began to negotiate the terms of the new Puig Group–Haenschen contract not later than April. During those negotiations Haenschen prepared projections that contemplated a scenario in which Puig Group would take over Cleveland

Hair's Rosemont operation "lock, stock and barrel" (Haenschen Dep. 133–34 and Ex. 8). Puig told Haenschen that their discussions were highly confidential, and Haenschen kept them secret (Haenschen Dep. 114–15).

31. On May 17 Haenschen signed a new contract with Puig Group that included a $250,000 "signing bonus" and other financial terms under which Haenschen's remuneration would be increased significantly (App. Ex. 7). That new agreement was negotiated before the expiration of the term of Haenschen's existing agreement (Puig Dep. 262–63). Although Haenschen and Puig had negotiated new contracts from time to time, Haenschen had never before received a signing bonus (Haenschen Sanction Tr. 655). Haenschen concededly knew that he was an important part of Puig's plans (*id.* 654).

32. It is unclear whether (as Cleveland Hair contends) Puig hired away its Washington, D.C. office manager C.J. Kerins by May 16. It is true that promotional materials found on Puig Group's Internet site and specified there as having been updated as of that date identify Kerins as a consultant in Puig's Houston facility (a facility never managed by Cleveland Hair) (CH Ex. 9). It is also true that neither Puig nor Kerins announced that arrangement until several months after that, when Kerins actually quit his employment at Cleveland Hair and started working as a consultant for Puig Group in Houston, just as the Internet materials indicated. But the page on which the legend "This site was updated 5/16/96" appears (*id.* at 1) bears an August 13 printout date, so the actual date when the initial reference to Kerins was made in the Internet materials is uncertain.

33. On May 24, the very day that the Notice was sent and before Cleveland Hair had any time to react, Puig also proceeded to attempt to co-opt Cleveland Hair employees and third parties with whom Cleveland Hair expected to have beneficial future relation-

---

7. Haenschen denies being approached by Puig until April, testifying instead that Puig told him in that month that Puig "absolutely was ending the relationship" with Cleveland Hair (Haenschen Dep. 111). Although this Court does not credit Haenschen's testimony as to the earliest

date on which Puig approached him, the Haenschen testimony as to such an April conversation is wholly credible and directly refutes Puig's story that Puig made no decision to leave until late May.

ships. Most though not all of those actions were targeted at the Rosemont facility, the "crown jewel" of the Cleveland Hair–Puig Group operations (Puig Doc. 70144–46). Those efforts by Puig are detailed in the ensuing Findings.

34. Puig first communicated with Drs. Mangubat and Feldman, the two Puig Group doctors other than Haenschen who worked at Rosemont. Dr. Mangubat was the only doctor at Rosemont who performed Brandy Flap procedures. Those calls were made to ensure that the doctors would not "jump" to Cleveland Hair (Puig Sanction Tr. 39; Puig Doc. 70144–46).

35. Puig then directed Bill McCarty ("McCarty"), the operator of a Cleveland Hair-affiliated facility in Detroit, Michigan ("Shear Point"), to wire transfer funds earmarked for a Cleveland Hair managed account to a Puig Group account that Puig alone controlled (Puig Sanction Tr. 40). That clearly unlawful activity was undertaken by Puig because he wanted to take control over Cleveland Hair's funds (*id.* at 41; Puig Doc. 70144–46)—an improper and illegal motive.

36. Puig next spoke with Lauren Comitor ("Comitor"), the "voice and face" of Cleveland Hair and its advertising consultant, to attempt to secure his services for Puig Group on an exclusive basis. When Comitor indicated in response that Cleveland Hair might attempt to affiliate with another doctor, Puig immediately instructed Comitor to change Cleveland Hair's Chicago area advertisements by substituting Puig's Houston telephone number for Cleveland Hair's telephone number (Puig Sanction Tr. 42–48; Puig Doc. 70144–46)—another clearly unlawful step.

37. Comitor also told Puig that Dr. Ray Konior ("Konior," another qualified hair transplant physician) was rumored to be a prospective replacement for the Puig Group doctors at Rosemont. Puig telephoned Konior immediately after his conversation with Comitor for the admitted purpose of preempting Cleveland Hair's attempt to recruit Konior to affiliate with its Rosemont office as a replacement for Puig Group (Puig Sanction Tr. 49–50; Puig Doc. 70144–46). Puig accomplished that objective: Cleveland Hair's later efforts to affiliate with Konior were not successful, and in fact Puig Group is currently operating in Konior's facility in Oakbrook Terrace, Illinois (Puig Dep. 463–64).

38. Before the Notice's specified termination date Puig also spoke with Cleveland Hair's Rosemont office manager Malmin and encouraged him to support Puig Group's ongoing practice during the 30 day pre-termination period. Puig told Malmin that Puig Group would accept employment applications as soon as that period was completed (Puig Sanction Tr. 51; Puig Dep. 276–77; Puig Doc. 70144–46). Puig followed that practice with all of Cleveland Hair's employees: He requested their continuing support and cooperation, put them on notice of his plans and let it be known that he would receive employment applications as soon as the 30 day period expired. That procedure was intended to convey the message to the employees that their future prospects were with Puig Group, so that Puig and Haenschen could carry out an important part of their plan: to keep the Cleveland Hair staff intact and to simply move that staff over to Puig Group (Puig Dep. 262; Haenschen Dep. 46, 60).

39. Puig knew that Cleveland Hair had no contingency plans in place to provide for the continuation of its business in the event that Puig Group sought to terminate the Agreement (Puig Dep. 379–80). Indeed, except for the Letter (the continued viability of which as a legitimate ground for premature termination of the Agreement is a subject of considerable doubt, and an issue not yet resolved by this Court, but on which Cleveland Hair certainly has more than "some likelihood of succeeding on the merits"[8]), the Agreement has only limited provisions for termination before its stated termination date in 2003 (see Agreement § 20).

40. Relatedly Puig also knew that Puig Group's relationship with Cleveland Hair accounted for all of the latter's revenues and

---

**8.** As Conclusion 6 reflects, that is the applicable standard on the current motion for a preliminary injunction.

that the hair transplant procedures performed at Cleveland Hair's Rosemont facility, which were primarily performed by Haenschen, accounted for substantially all of Cleveland Hair's profits (Puig Dep. 379, 383–87). Similarly, Haenschen knew that Cleveland Hair had no plans in place to replace his services in the event that he stopped working at the Rosemont facility (Haenschen Tr. 9/19/96).

*Defendants' Conduct After the May 24 Notice*

41. During the 30 day post-Notice period, defendants continued to cement their relationships with Cleveland Hair's employees and the other parties on whom Cleveland Hair was dependent for its operations. Both Puig and Haenschen essentially testified that they saw nothing wrong either with that activity or with any of their other efforts to take over the Rosemont operations to the exclusion of Cleveland Hair, because the latter was "only a management company" that served Puig Group.

42. On May 29 Puig attempted to divert all incoming funds to an account that only he controlled (App.Ex. 23), an effort that was in violation of the established rights of the parties. Consistently with the nature of the relationship between the parties, their uniform practice had always been that all Puig Group revenues would be deposited in the first instance into accounts managed and controlled by Cleveland Hair (a procedure essential to its ability to obtain reimbursement of its out-of-pocket expenses, for the benefit of the parties' joint venture, the only available source of such reimbursement being the operations of the hair transplant facilities). Puig Group's new account was established at the bank that was financing its new venture and that had provided the funds used by Puig to pay Haenschen's signing bonus, with the bank account having been pledged to secure Puig Group's loan (App. Ex. 24; Puig Dep. 280–81). At the same time Puig has withheld, and continues to withhold, monies that are owed to Cleveland Hair, the majority of which constitute reimbursement for those out-of-pocket expenses (Puig Dep. 407). By refusing to pay those amounts Puig Defendants have also deprived Cleveland Hair

of revenue necessary for its continued operations. Although Puig seeks to justify that refusal by making assertions of improprieties on the part of Cleveland Hair, his unilateral self-help action amounts to nothing more than an improper (and impermissible) attempt to destroy Cleveland Hair.

43. During the same 30 day post-Notice period and while still obligated to operate under the Agreement, Puig negotiated agreements for the sale of Cleveland Hair's patient lists and patient files at its east coast facilities (App. Ex. 20–22; Puig Sanctions Tr. 55–65; Puig Docs. 70765–70794). Puig intended to keep all proceeds derived from those sales (Puig Dep. 45–46). Those patient lists and files include marketing and other information obtained by Cleveland Hair. Indeed, all or substantially all of the patients on the lists were secured by Cleveland Hair. Puig's sales or attempted sales of patient medical records were without any patient consents and thus appear to be at odds with the medical records policy that Puig himself had drafted (Puig Dep. 31–46). But leaving that aside, Puig's testimony that he never intended to collect any amounts for the sales of the medical records or practices, and that he had some other purported purpose for including specified dollar amounts in the brief letter agreements that he himself prepared to reflect his deals with the other doctors, is entirely incredible—that testimony need only be read to see just how contrived and unpersuasive it is.

44. On June 16 Puig offered to sell the practices of two of Cleveland Hair's facilities (Union and King of Prussia) to a Doctor Horace McVaugh ("McVaugh"), who he had learned was considering affiliating with Cleveland Hair (Puig Doc. 70396). When McVaugh rejected Puig's offer and affiliated with Cleveland Hair instead, Puig sold the practices to another doctor for a lesser amount and then named McVaugh as a defendant in his Counterclaim in this case (Puig Sanctions Tr. 67–74; Puig Doc. 70172). Although Puig knew that McVaugh was qualified to perform hair transplant procedures in all respects, as Puig's own offer to sell the practices to McVaugh confirms, Puig's Counterclaim against McVaugh asserts otherwise.

It must be concluded that Puig Defendants' Counterclaim was filed to harass McVaugh and to scotch his affiliation with Cleveland Hair. Indeed, the allegations of the Counterclaim generally, and those against McVaugh in particular, were made without any basis. For example, when Puig was asked at his deposition to substantiate the allegations asserted against McVaugh, he admitted that he did not even know whether McVaugh was performing hair transplant procedures (Puig Dep. 231):

> Again, he may have been lancing moles or abscesses.

45. As for Haenschen, during the 30 day post-Notice period he was taking directions from Puig and Puig Defendants' lawyers, who directed him not to meet with Cleveland Hair's President (Haenschen Dep. 277–79).

46. On June 19, one week after this action was filed and immediately before they responded by seeking preliminary injunctive relief from this Court, Puig Defendants made an eleventh hour proposal that illustrates their strategy and objective.[9] They offered to take over the Rosemont facility and Cleveland Hair's future obligations, knowing that the 30 day post-Notice period was about to expire (so that the Agreement would terminate under the terms of the Notice) and that through their efforts Cleveland Hair was unprepared to continue in business (see, e.g., Puig Dep. 94–95, stating that he held off looking for office space because of the hope of taking over Rosemont; Haenschen Dep. 145). Puig Defendants and Haenschen thought that they had Cleveland Hair "over a barrel" and positioned so that it would have no practicable alternative other than ceding the Rosemont office and all of its business to them.

47. Puig admits that Rosemont was his objective, but he now claims that he was willing to let Cleveland Hair carry on in all of the other locations where it had facilities (Puig Dep. 95–96).[10] Even if he were in fact prepared to divide territories in that manner

(a highly questionable assumption), that arrangement would have been extremely unfair to Cleveland Hair, to say the least. As already stated, the Rosemont facility was the source of all or substantially all of the profits of the entire Cleveland Hair–Puig Group hair transplant operation.

48. Moreover, there is no evidence that Puig Defendants ever communicated a proposal to Cleveland Hair by which it would continue in the other offices. As heretofore found, Puig had already sold at least some of the practices of the other facilities—sales that were unknown to Cleveland Hair and that were obviously inconsistent with Puig's supposed plan to "let CHC have" the other facilities. And when Puig learned that Cleveland Hair intended to continue in business in the facilities other than Rosemont, he responded by threatening Cleveland Hair and by telling it that it had no right to stay in business or to enter into any new arrangement that was not sanctioned by Puig. As he wrote in CH Ex. 2 at 2:

> It is my understanding that CHC is negotiating with other physicians on the East Coast to render future medical care to patients of Puig Medical Group. Such conduct is absolutely inappropriate and illegal and must cease immediately.

That was all of a piece with Puig's view that because Cleveland Hair was a management company, it had no right to affiliate with new doctors and thus to "compete" with Puig Group. That view is of course inconsistent with the parties' arrangement (in whose design and structure Puig had been an active participant), under which Cleveland Hair did not itself practice medicine but nevertheless played an integral and vital role in the delivery of medical services (hair transplants) to the customer-patients of the operation.

49. During the 30–day post-Notice period Haenschen purported to act as a self-proclaimed "peacemaker." In that posture he succeeded in setting up a meeting (ultimately unproductive) between Cleveland Hair's and Puig's representatives in late June, ostensi-

---

9. That proposal was then made part of Puig Defendants' June 21 motion for a temporary restraining order.

10. That claim is inconsistent with Puig's selling and attempting to sell the practices at the other locations, including his conduct with respect to McVaugh.

bly to see if the parties could resolve their problems. Malmin worked with Haenschen to set up the meeting, hoping to restore the relationship between the parties. However, Malmin and Cleveland Hair were then unaware of all that Puig and Haenschen had done. Among other things Haenschen had not disclosed his signing bonus, his involvement and participation in Puig's plans or the fact that neither he nor Puig Defendants had any intention of restoring the relationship between Puig Group and Cleveland Hair (Malmin Dep. 467–68).

50. Instead Haenschen's true purpose in facilitating the late June meeting and in posturing himself as a neutral was to further Puig Defendants' and his plans by attempting to induce Cleveland Hair and Malmin to cooperate with them and to assist their transition to their new venture by encouraging Cleveland Hair to accede to the proposal described in the June 19 letter (see Finding 46) or to comparable terms. When the meeting failed to achieve the desired results, Puig Defendants and Haenschen simply moved along with the steps required to secure the Rosemont operation without Cleveland Hair's cooperation. Immediately after the meeting ended, Puig extended an offer to Malmin to stay with the "PMG team" (Puig Dep. 276). That same evening Haenschen also set up a meeting for the balance of the Rosemont staff (see Finding 51), at which offers to work for Puig Group and promises of enhanced benefits were extended to the staff-members (Haenschen Dep. 45–46 and Ex. 3).

51. Not later than late June Puig and Haenschen offered employment to virtually all key Cleveland Hair employees, including all of the nurses and medical assistants at Rosemont (seven of whom ultimately accepted employment with the new venture), Malmin, Cleveland Hair's telemarketer and the supervisor of its east coast operations (Puig Dep. 275–76; Haenschen Dep. 56).[11] Their subsequent hiring of Cleveland Hair's employees gutted the Rosemont office, depriving it of an experienced support staff (as well

as depriving it of doctors to perform surgeries).

52. In making the offers described in Finding 51, Puig Defendants and Haenschen promised Cleveland Hair employees enhanced benefits if they came to work for Puig Group. Those benefits included (a) payment for missed work attributable to defendants' actions in leaving Cleveland Hair without doctors and hence unable to conduct surgery and (b) better insurance benefits (Haenschen Dep. 50–54, 285 and Ex. 17).

53. Solicitation of Cleveland Hair's employees to quit its employ and to work for Puig Group took place despite the knowledge that the employees had restrictive covenants. In fact, Haenschen actually had Michael Tinaglia ("Tinaglia"), the lawyer who was then representing both him and Puig Defendants, prepare an "opinion letter" about the invalidity of the restrictive covenants—even though Tinaglia had never actually read any of those covenants (App.Ex. 19). Haenschen then distributed the opinion letter to the Rosemont staff at a June 28 meeting, which he had initiated and planned several days earlier (Haenschen Dep. 60–61). Haenschen (with Puig's blessing) also told the Rosemont staff that Puig would indemnify them if Cleveland Hair attempted to enforce its restrictive covenants (Haenschen Dep. 62). Haenschen claims that the opinion letter was harmless in any event because Malmin made statements to the effect that in his opinion Cleveland Hair was not likely to enforce its restrictive covenants, but Malmin's statements were not made until *after* Haenschen's meeting. By that time the employees already had the so-called opinion letter and defendants' other promises, so that Cleveland Hair needed to curry favor with the employees (hoping to persuade them to stay with or return to Cleveland Hair) because of the inducements they had received from Haenschen (Malmin Dep. 129–31).

54. By contrast, Puig announced his intention to enforce covenants not to compete that had been signed by Puig Group doctors, an announcement intended to prevent the

---

11. See Finding 32 as to the question whether Kerins had already signed on with Puig Group at that time.

doctors from continuing to work at the Cleveland Hair facility (Malmin Dep. 168–69; Puig Dep. 115, 258). Thus Puig has both prevented former Cleveland Hair employees from returning to its employ and prevented Puig Group doctors from working at Cleveland Hair facilities (Malmin Dec. ¶¶ 5–7; Puig Dep. 422–33).

55. On July 1 Haenschen, with Puig Defendants' concurrence, support, financing and assistance and acting through Tinaglia (who was then acting as counsel for *all* of Puig Defendants and Haenschen, though he concealed his representation of the latter by causing a lawyer friend to appear for Haenschen in the state court) engaged in the bad faith institution of a lawsuit in the Circuit Court of Cook County against Malmin and a doctor with whom Cleveland Hair was seeking to affiliate. That lawsuit was preceded by threatening letters to the doctor and to Malmin. Haenschen's and Puig Defendants' objectives in taking those actions were to harass and threaten the named defendants, to impede their relationships with Cleveland Hair and improperly to preempt this Court's ability to address a critical question that this action had presented to it in the first instance: the relative rights and duties of the parties in connection with the patient records of the hair transplant operation. Quite apart from any misrepresentations or other inaccuracies in the Circuit Court Complaint, (App. Exs. 1 and 2),[12] the impropriety involved in connection with the Circuit Court proceeding has been fully described in this Court's October 22 memorandum opinion and order, the first of two opinions dealing with the issue of sanctions after an evidentiary hearing ("Sanctions Opinion 1"), and will not be repeated here.

56. In August Puig directed McCarty of Shear Point to refuse to return to Cleveland Hair certain equipment that had been used by the Detroit affiliate. Puig admits that he gave that direction to McCarty despite Puig's having no reason whatever to believe that the equipment was not in fact owned by Cleve-

land Hair (Puig Tr. 9/18/96). In fact Puig Group's own audited financial statements show that it did not own any equipment (App. Ex 25). Puig had no justification in fact or in law for interfering with Cleveland Hair's attempt to retrieve that equipment. Puig Group's financial statements similarly refute the claims made by Puig Defendants asking this Court to adjudicate Puig Group as the owner of the equipment in Cleveland Hair's facilities (see App. Ex. 12 ¶ 16).

57. Through August Puig Group was using marketing materials on which Cleveland Hair had the copyright (Puig Dep. 433–36). In addition Puig has had access to a Cleveland Hair database containing extensive information on patients that he took with him after Puig Group terminated the Agreement. Puig has used that and other information generated by Cleveland Hair to promote Puig Group's competitive venture (Puig Dep. 159–62, 394–97).

*Further Relevant Findings*

58. Except for his lack of knowledge (a) of the provisions of the Agreement and consequently (b) of the invalidity of the termination dealt with in the Summary Judgment Opinion, Haenschen was a knowing and integral part of the scheme that was hatched by Puig and implemented by the service of the termination Notice and the post-Notice activity referred to in these Findings. With that exception, at all relevant times each of Puig Defendants and Haenschen was acting as the agent for the other.

59. All of defendants' acts have been done in furtherance of that scheme. Although Puig and Haenschen certainly have a legitimate interest in providing (and a professional obligation to provide) continued patient care, none of the actions described in these Findings was based on a genuine desire to carry out that obligation or to accomplish other legitimate goals, except to the extent that such obligation or other goals happened to coincide with their business ob-

---

**12.** For example, that Complaint alleged that patients formerly treated by Haenschen had undergone surgery at Cleveland Hair's facility as of July 1, even though that had not taken place when the Complaint was prepared or when it was filed. These Findings need not parse the particulars of that Complaint—for as stated in the text, the major vice of its filing was as stated by this Court in Sanctions Opinion 1.

jectives (importantly including the objective of eliminating Cleveland Hair as a "competitor" in the provision of hair transplant services, not by performing such services itself but by contracting with other doctors to provide such services in Cleveland Hair's facilities).[13] Based on all of the credible testimony, the Puig–Haenschen claims that their purpose in seeking to obtain patient files is to serve the medical needs of the patients is pretextual—instead their motivation is primarily (if not exclusively) anticompetitive.

60. As the parties' own past practices demonstrate, the records of a patient's prior hair transplant procedures are not necessary to the performance of later procedures. For instance, before this litigation the Rosemont facility had never received any requests from former patients for the transfer of their records. Similarly, no Puig Group doctor at Rosemont had ever requested any patient to obtain the transfer of his medical records from a previous treating physician (Malmin Tr. 9/18/96; Malmin Dep. 60–61).

61. Cleveland Hair's business has been in dire straits since termination of the Agreement (Leonhard Dep. 335). In Rosemont its revenues have dropped dramatically compared to revenues of the same months in 1995 (Malmin Dep. 381–34 and Ex. 12). Its officers and Malmin are not being paid amounts that they are owed for salary and services rendered (Douglas Dec. ¶¶ 5–6; Malmin Dep. 20–21). Its revenues since the termination are substantially less than its fixed expenses. It cannot operate indefinitely if such conditions continue (Douglas Dec. ¶¶ 3–4).

62. There are several related reasons for Cleveland Hair's loss of revenue, all of which are attributable to defendants' acts. Among other things:

(a) Cleveland Hair's present Rosemont staff is not as productive as the staff that was in place before the termination (Mal-

min Dep. 232–34). It will take as long as a year for the new staff to achieve pre-existing efficiency levels (*id.*).

(b) Cleveland Hair lacks sufficient physician coverage to replace Haenschen and the other Puig Group doctors who worked at Cleveland Hair's facilities before the termination.

(c) Cleveland Hair has not been able to affiliate with any doctors who can perform Brandy Flaps at Rosemont. Its specialized room designed for that procedure is not being utilized.

(d) Cleveland Hair is without the funds necessary to conduct marketing at desired levels. No advertisements were published from the termination until mid-September (Haenschen Dep. 441).

In sum, defendants' actions have left Cleveland Hair as a virtual start-up (and failing) operation.

63. All of this has occurred even though Cleveland Hair has made extensive efforts to affiliate with other doctors and generally to maintain its business. Its current hardships and adverse circumstances are not attributable to any wrongdoing on its part or to its failure to take any action that it was required to take. Thus, for example, to the extent that it may have entered into a relationship with any doctor who (according to defendants) may be less desirable than Puig Group as an affiliate of Cleveland Hair, it was forced to do so by the desperate position in which it was left by defendants.

64. In short, Cleveland Hair's very existence is threatened as a result of defendants' acts.

*Conclusions of Law*

1. This Court has jurisdiction under 28 U.S.C. § 1332. Venue is proper in this judicial district under 28 U.S.C. § 1391(a).

---

13. "Competitor," as a term applicable to Cleveland Hair, should be understood throughout these Findings and Conclusions in the limited sense described in the text: not as any entity seeking to deliver the physical hair transplant services itself (something that Cleveland Hair concededly cannot do, for such services may be provided only by doctors), but rather as an entity able to develop an organization by affiliating with doctors in the same way as (or in a way similar to) its Agreement with Puig Group, so that Cleveland Hair's ability to contribute its skills and abilities to the total venture—and its corresponding ability to use its facilities—will not be lost or destroyed.

2. All evidence offered at the sanctions hearing is admissible for all purposes and has been considered by this Court in making the Findings, except for any direct evidence of communications between defendants and their lawyers before June 27. That excepted evidence has been treated as admissible only for purposes of the sanctions motions and was not considered in arriving at these Findings and Conclusions.[14]

■ 3. However, evidence introduced at the sanctions hearing about attorney-client communications from and after June 27 is not protected by the attorney-client privilege. Beginning at least as early as that date all defendants and their lawyers were engaged in a wrongful scheme, described in detail in Sanctions Opinion 1. As held there, the wrongful scheme included deceptive conduct in this Court violative of Rules 11 and 37 and 28 U.S.C. § 1927, and sanctionable pursuant to this Court's inherent powers (*Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Specifically, this Court finds that defendants engaged in the conduct detailed in the chronology of defendants' and Michael Tinaglia's bad faith litigation conduct attached to Sanctions Opinion 1. Accordingly the crime-fraud exception to the attorney-client privilege is applicable (see, e.g., *Sound Video Unlimited, Inc. v. Video Shack Inc.*, 661 F.Supp. 1482, 1487 (N.D.Ill. 1987) and cases and article cited there).

■ 4. This Court's exercise of its discretion in reviewing Cleveland Hair's request for a preliminary injunction requires Cleveland Hair to show its satisfaction of each of the standards identified in *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984):

(a) a likelihood of success on the merits;

(b) the inadequacy of any remedy at law;

(c) irreparable harm to Cleveland Hair from a denial of the preliminary injunction;

(d) the balancing of that harm if the injunctive relief were wrongfully denied against the harm to defendants if injunctive relief were wrongfully granted—a balancing that must favor Cleveland Hair; and

(e) the absence of disservice to the public interest if the preliminary injunction is granted.

As more particularly described in the ensuing Conclusions, Cleveland Hair has amply demonstrated that each of those standards is met here.

*Likelihood of Success: Contract Claim*

■ 5. This Court has just held on November 20 in the Summary Judgment Opinion that Cleveland Hair is entitled to a judgment as a matter of law on Amended Complaint Count I (and these Conclusions of course adopt what has been said in that opinion). That alone far more than satisfies the more modest "likelihood of success" factor under the *Roland Machinery* analysis (see 749 F.2d at 387) as to Puig Group (the party obligated under the Agreement) as well as to Puig and Haenschen, each of whom has acted in concert with Puig Group and as its agent.

6. Although this further Conclusion is not needed to support the present decision, and although this Court has not been provided with sufficient input from the litigants to support a substantive ruling on the merits of the issue, it also appears that the low threshold referred to in *Roland Machinery*, 749 F.2d at 387 ("some likelihood of succeeding on the merits" and "the plaintiff's chances are better than negligible") is also satisfied as to Cleveland Hair's claim regarding the independent invalidity of the Notice because of its timing in relation to the date of the Letter and in relation to what has occurred since the Letter was entered into.

---

**14.** Cleveland Hair has not requested a determination as to the applicability of the attorney-client privilege to any communications about which evidence was received at the sanctions hearing, other than those occurring on and after June 27. This Court has therefore made no findings about whether defendants' prior attorneys (Tinaglia's law firm) were participants in any wrongful conduct before that date, or whether the crime-fraud exception is applicable to any pre-June 27 communications.

*Likelihood of Success: Other Claims Against Puig Defendants*

7. Cleveland Hair has also demonstrated more than the requisite likelihood of success, within the meaning of *Roland Machinery* and later cases, on its other claims—claims that assert a breach of the duties owed to Cleveland Hair by Puig Defendants by reason of the parties' status as co-venturers and by reason of the additional duties owed by Puig in his various capacities as a shareholder, employee, officer and director of Cleveland Hair. In those respects the evidence demonstrates that Puig Defendants utilized the invalid termination Notice to implement their opportunistic plan to take over all or substantially all of Cleveland Hair's business, assets and goodwill, and to leave Cleveland Hair in a position in which it would have virtually no chance of surviving as a viable business entity. While Puig Defendants apparently did not actually start the operations of their new venture before the effective date of the termination Notice, they did engage in impermissible pre-termination activities that coupled Puig Group's invalid Notice with, among other things, interfering with the relationships that Cleveland Hair enjoyed with its employees and its advertising agency (including Comitor, the "voice and face" of Cleveland Hair); obtaining a commitment and covenant not to compete from Haenschen, the doctor on whom Cleveland Hair was dependent for its Rosemont operation; arranging for Puig Group itself to be unavailable to Cleveland Hair, thus leaving it without any doctors; failing to give Cleveland Hair adequate notice of their plans; selling the practices, files and patient lists of several of Cleveland Hair's east coast operations; and frustrating Cleveland Hair's efforts to arrange for the continuation of its business following the termination.

8. In addition, immediately following the effective date of the termination, Puig Defendants not only piggybacked onto Puig Group's invalid Notice by engaging in further activity to Cleveland Hair's detriment but also committed other independently wrongful acts, some of which exploited information acquired during the existence of the fiduciary relationship. Puig Defendants' post-termination conduct included hiring key employees from Cleveland Hair's Rosemont operations and interfering with its ability to enter into relationships with other doctors. Those acts were aimed at rendering Cleveland Hair unable to continue in business as a viable competitor, if at all. That conduct is unlawful notwithstanding the fact that Puig Group did not actually begin operating its new venture before the termination became effective (see, e.g., *Comedy Cottage, Inc. v. Berk,* 145 Ill. App.3d 355, 361, 99 Ill.Dec. 271, 276–77, 495 N.E.2d 1006, 1011–12 (1st Dist.1986); *Smith–Shrader Co. v. Smith,* 136 Ill.App.3d 571, 578, 91 Ill.Dec. 1, 6–7, 483 N.E.2d 283, 288–89 (1st Dist.1985); *H. Vincent Allen & Assocs., Inc. v. Weis,* 63 Ill.App.3d 285, 291–92, 19 Ill.Dec. 893, 898, 379 N.E.2d 765, 770 (1st Dist.1978)). Moreover, Puig Group, under its Agreement with Cleveland Hair as well as pursuant to the parties' long-standing practices, controlled the doctors—an admittedly scarce resource and one that Cleveland Hair needed to stay in business. Thus Puig Defendants knew that Cleveland Hair's business could be decimated, and hence that Cleveland Hair could be positioned for Puig Defendants' coup, without the need for their actual commencement of their new business operations before the termination became effective (see, e.g., *National Gas Appliance Corp. v. Manitowoc Co.,* 311 F.2d 896, 900 (7th Cir.1962)) and early Illinois cases cited there; *James C. Wilborn & Sons, Inc. v. Heniff,* 95 Ill.App.2d 155, 163, 237 N.E.2d 781, 786 (1st Dist.1968) (confirming the actionability of "a proven plot to destroy another's business. *Duane Jones Co. v. Burke,* 306 N.Y. 172, 117 N.E.2d 237 (1954)"). In that respect the adoption of a "belt and suspenders" strategy by Puig Defendants and Haenschen, involving wrongful pre-termination acts, simply shows that they were not taking any chances. They did everything they could think of to ensure that they would accomplish their objectives.

9. Much of what has been said to this point is based on undisputed evidence, including defendants' own testimony and documents that they authored. Indeed, to the extent that Puig offered any purported "defense" to Cleveland Hair's charges, he did not deny or controvert the underlying facts but rather attempted to explain why his ac-

tions were not malicious or in bad faith, or why they were purportedly justified. To begin with, bad faith on the part of Puig Defendants is not as such essential to the success of Cleveland Hair's claims. But even if it were, this Court rejects Puig's explanations, as the evidence has developed to this point, and finds that his actions were part of an opportunistic plan to ambush Cleveland Hair and to leave it in a position in which it would have no viable alternative other than to turn over its Rosemont operations "lock, stock, and barrel" to Puig Group.[15] Relatedly Puig has failed to establish that he acted in the manner that he did because of any controlling professional standard or ethical obligation.

10. To the extent if at all that Puig's testimony may be deemed to dispute the evidence on which Cleveland Hair relies or the inferences that readily may be drawn from that evidence, his testimony is not credible. Puig was frequently impeached on material matters, and his answers were frequently evasive. Moreover, his explanations for his conduct were self serving after-the-fact attempts to justify what he did, not grounded in a credible or plausible view of the parties' relationship and their past practices of long standing, or truly grounded in professional standards. In addition, Puig and his then counsel also withheld critical documents and evidence from disclosure until compelled to do so by Cleveland Hair's efforts.

*Likelihood of Success: Claims Against Haenschen*

■ 11. Cleveland Hair has also demonstrated the requisite likelihood of success (in *Roland Machinery* terms) on its claims that Haenschen participated in and assisted Puig Defendants in breaching the duties that they owed to Cleveland Hair (though not on its claim that Haenschen wrongfully induced the breach of the Agreement by Puig Group's

invalid termination Notice). Although Haenschen did not know any of the particulars of the Agreement, he knew generally (a) of the relationship between Puig Group and Cleveland Hair, (b) that Cleveland Hair was dependent on Puig Group and particularly on Haenschen himself for its ability to conduct business operations in the Rosemont office, where Haenschen had performed most of the surgeries for many years, and (c) that no contingency plans existed that would permit Cleveland Hair to continue to function in Rosemont if Haenschen and the staff employed by Cleveland Hair there were to quit.

12. As evidenced by the Cleveland–Hair–takeover projections that Haenschen prepared and the unprecedented $250,000 signing bonus that he received, as well as the contemporaneous increase in his fee-for-service schedule, Haenschen also knew (a) that he was critical to Puig Defendants' plans, (b) that Puig could not terminate his relationship with Cleveland Hair and take over the Rosemont operation without Haenschen and (c) that Puig was planning a surprise attack to maximize Puig Group's advantage. Haenschen furthered that plan by signing on and allying himself with Puig and by complying with Puig's request for secrecy.

■ 13. Cleveland Hair was an intended third-party beneficiary of the relationship that existed between Haenschen and Puig Group, whose agreements with Haenschen and the other doctors were entered into so that Puig Group could satisfy its obligations to staff Cleveland Hair's facilities (see, e.g., *Weil, Freiburg & Thomas v. Sara Lee Corp.*, 218 Ill.App.3d 383, 393, 160 Ill.Dec. 773, 781, 577 N.E.2d 1344, 1352 (1st Dist.1991) and cases cited there). There is no question that Haenschen was well aware of that purpose of the relationship, which refutes his contention that he was "only" an independent contractor of Puig Group and owed no related duty to Cleveland Hair.[16]

---

**15.** It should be understood that, in consequence of Puig's improper termination Notice, the record has not been developed as to Puig's claim that Cleveland Hair has engaged in improper fee-splitting (see the Summary Judgment Opinion at 9, 14).

**16.** Puig Defendants owed Cleveland Hair a corresponding duty to enforce the agreements with doctors for the benefit of the relationship that existed between Cleveland Hair and Puig Group (see *Chicago Title & Trust Co. v. Weiss*, 238 Ill.App.3d 921, 926, 179 Ill.Dec. 78, 82, 605 N.E.2d 1092, 1096 (2d Dist.1992)). Puig Group breached that duty.

14. Haenschen also participated in Puig Defendants' scheme in a number of other ways: by soliciting Cleveland Hair's Rosemont staff to induce them to quit their employment there and to enter Puig Group's employ instead; by complying with the request of Puig and Puig's lawyers that he refuse to meet with Cleveland Hair's President; by utilizing Puig Defendants' lawyers to represent him and to direct his actions in furtherance of the new venture; by threatening Malmin; by threatening a doctor with whom Cleveland Hair was attempting to establish a relationship; and by filing the earlier-referred-to state court lawsuit against that doctor, Malmin and Cleveland Hair. All of those actions were motivated by Haenschen's economic self-interest and by his desire to ensure the success of Puig Defendants' and his new venture.

15. Haenschen knowingly decided to cast his lot with Puig Defendants and to join their scheme with all of its attendant risks. Among other things, the notes prepared by Haenschen's former lawyer Tinaglia reflects that Haenschen was aware of the risks and exposures of joining forces with Puig, but that he did so with indifference to those risks. When told of those risks by Tinaglia, Haenschen responded "It's war—harm to Carlos [Puig], harm to me" (Tinaglia Dep. Exs. 6 and 7 at 12; see also Tinaglia Dep. Ex. 6 and 7 at 11, stating that Haenschen "realizes risk" of filing the state court action "but says he and Carlos must go forward").

16. What was said as to Puig Defendants in Conclusion 9 is equally true as to Haenschen: In principal part the evidence supporting the foregoing Conclusions is undisputed and is based on Haenschen's own testimony and notes and on uncontroverted documents. Haenschen's proffered explanations likewise do not constitute a legal justification for his knowing participation in Puig Defendants' scheme.

17. Although Haenschen is not himself a fiduciary vis-a-vis Cleveland Hair, his conduct clearly renders him liable to it. Under Illinois law a person who knowingly colludes with a fiduciary or assists the fiduciary in breaching its duties is also liable for the breach (see, e.g., *Appley v. West*, 832 F.2d 1021, 1030–31 (7th Cir.1987) and cases cited there).

18. As is true with Puig, some aspects of Haenschen's testimony also lacked credibility so as to impair his attempted justifications of his conduct. Thus Haenschen's testimony about many of the events surrounding the filing of the state court litigation was materially impeached, and he was also impeached in such matters as these:

(a) Although Haenschen testified during his July 5 deposition that the meeting at which he solicited the Cleveland Hair staff was scheduled because the nurses requested it, he later produced notes that showed that he had planned and initiated the meeting before he ever communicated with the nurses (Haenschen Dep. Ex. 17).

(b) Haenschen's testimony at his deposition that he was not interested in offering a job to Cleveland Hair's telemarketer was misleading at best. To the contrary, Haenschen's notes show that he instructed Puig to extend an offer to the telemarketer and even dictated the terms of the offer (Haenschen Dep. Ex. 17; compare Haenschen Dep. 72–74 with *id.* 287–88). And see also Haenschen Dep. 70 and Ex. 3, which turned out to be false in the light of his later testimony given after critical documents were finally produced (compare Haenschen Dep. 285 and Ex. 17).

(c) Most significantly, Haenschen like Puig explained much of his conduct as being motivated by his asserted desire to get the files of patients whom he had treated so that their continuing treatment would not be jeopardized. That explanation is incredible in light of (i) the economic considerations that this Court has found were really the driving force behind the actions of Haenschen and Puig; (ii) the fact that patient files were sought en masse as part of a mail solicitation to all past patients (whether or not their treatment plans called for further procedures); and (iii) Malmin's testimony (uncontroverted by either Haenschen or Puig) that Haenschen had *never* requested files from any patient's prior treating physicians during the time that he was associated with Cleveland Hair, even though Haenschen

frequently performed surgery on patients for whom other doctors had performed hair transplant procedures before they were treated by Haenschen.

19. Even though this Court has credited Haenschen's testimony that he was not aware of the terms of the Agreement, that is really beside the point. For purposes of Cleveland Hair's claims as asserted against Haenschen, it is sufficient that he was aware that there was a long-standing relationship between it on the one hand and Puig Defendants on the other, that Haenschen played an integral role in the relationship and that Cleveland Hair had a reasonable expectation that the relationship would continue (cf. *Dallis v. Don Cunningham & Assocs.*, 11 F.3d 713, 717 (7th Cir.1993) (awareness of course of dealing and conduct that formed basis of the contractual relationship is sufficient)). There was ample evidence of each of those matters.

*Other Merits–Related Issues*

20. Before Puig Group's attempted termination of the Agreement, Cleveland Hair and Puig Group were engaged in a lawful business venture. Cleveland Hair had and has a proper interest in the venture, and it was and is absolutely entitled to engage in lawful activities in competition with Puig Group (in the previously-explained sense) to maintain its business, and to attempt to replace Puig Group as its joint venturer in that business by entering into relationships with other doctors (cf. *Galinski v. Kessler*, 134 Ill.App.3d 602, 610–11, 89 Ill.Dec. 433, 439–40, 480 N.E.2d 1176, 1182–83 (1st Dist.1985)).

21. Puig asserted in his testimony that Cleveland Hair's interest in the patients who had been identified as a result of its marketing efforts either changed or terminated altogether at the time that the patients received treatment from a Puig Group doctor. On that impermissible predicate the result would be to burden Cleveland Hair with obligations imposed on no other competitor of its own or of Puig Group: the supposed obligation to advise all patients that they have the option of receiving further treatment from Puig Group physicians, the supposed obligation to ensure that Cleveland Hair will affiliate only with doctors approved by Puig Group, and so

on. There is no basis for any of those contentions or for finding that Cleveland Hair's future business activities should be so constrained.

■ 22. Puig Group has failed to establish that it has ownership rights (to the exclusion of Cleveland Hair) in the patients' and other files that have been and are maintained in the Cleveland Hair facilities. There is authority under Illinois law supporting the existence of the rights sought to be asserted by Cleveland Hair here in those respects, in its capacity as the owner-manager of the facility where the services were performed (see, e.g., *People v. Bickham*, 90 Ill.App.3d 897, 900–01, 46 Ill.Dec. 315, 317–18, 414 N.E.2d 37, 39–40 (1st Dist.1980), aff'd. on other grounds, 89 Ill.2d 1, 59 Ill.Dec. 80, 431 N.E.2d 365 (1982); cf. *Prentice Medical Corp. v. Todd*, 145 Ill.App.3d 692, 700–01, 99 Ill.Dec. 309, 315–16, 495 N.E.2d 1044, 1050–51 (1st Dist.1986) (operators of clinics have a protectable interest in patient lists, patient records and related information)).

23. Puig Defendants and Haenschen have identified no legal basis for their claim that such case law authorities dealing with medical records are somehow inapplicable because Cleveland Hair was not medically licensed (as it was and is not required to be). That contention is simply a non sequitur.

24. To the extent that Puig Group had any rights in or with respect to the files, those rights were necessarily limited to the records that reflect or relate to the rendition of medical services. By contrast, the files maintained at Cleveland Hair's facilities contain substantial information other than medical records, importantly including marketing information and consulting plans prepared by Cleveland Hair. Indeed, the majority of the so-called medical portions of these records were also prepared by Cleveland Hair's consultants, nurses, surgical assistants and other employees. Even during the parties' relationship, Cleveland Hair's rights in those portions of the records were at least as great as the rights of Puig Group, as the parties' own operating manual (prepared by Puig) confirms (App.Ex. 26).

25. Cleveland Hair has more than a negligible likelihood of success in its argument that Puig Group's improper conduct, including its invalid termination of the Agreement, has disentitled it to attempt to assert whatever rights or interest it could claim in the records and files maintained during the parties' relationship. That alone could preclude Puig Defendants from advancing those rights as a defense to or as a limitation on Cleveland Hair's right to preliminary injunctive relief, but these Conclusions will go on to review (though briefly) defendants' disentitlement on other grounds.

26. No controlling principles of medical ethics or professional responsibility tendered during the Hearing support or justify any of Puig Group's conduct. Defendants failed to offer any, and Puig himself was not competent to testify on those issues because of his lack of personal knowledge, expertise and familiarity with the literature proffered (really as an afterthought) as a source of medical ethics.

27. It is only parenthetically relevant that the only section of the AMA's Code of Ethics ("Code") on which Puig now claims to rely is really inapplicable to the Cleveland Hair–Puig Group relationship (PD Ex. 2 at 96). Even more importantly, Puig's obvious ignorance of the provisions of that Code before (and even during) the Hearing confirms what Puig Defendants' argument in those terms really amounts to: a transparently post hoc lawyer-devised effort to rationalize a course of conduct whose goal was not really ethical or the preservation of patients' rights, but purely anticompetitive. It is candidly unethical for Puig Defendants to invoke "medical ethics" as the cover story for their real motivation: to provide an escape clause from their obligations to Cleveland Hair and to give them a marked, if not insurmountable, competitive advantage.

28. In that same respect, the bogus nature of Puig Defendants' purported reliance on professional ethics is additionally demonstrated by the selective manner in which they themselves deal with the Code's provisions. Thus although Puig asserts that he would not engage in practices discouraged by the Code, he also concedes that Puig Group routinely uses restrictive covenants in contracts with doctors and that a section of the Code explicitly discourages the use of such contractual provisions (see the Code's 1996–97 ed. at 138). Indeed, the contract negotiated by Puig and Haenschen before the attempted Cleveland Hair termination, by which Haenschen secured his $250,000 signing bonus, has just such a restrictive covenant: a contract "right" that Puig fully expects to enforce. Similarly, Puig testified that Puig Group has never sent out notices advising patients of the departure of doctors from the Group, or of the departing doctors' new practice locations (Puig Tr. 9/19/96), though such notices are required under the Code provision that Puig claims to be applicable (PD Ex. 2 at 96). In sum, Puig Defendants appear to follow medical ethics when they believe that such adherence otherwise suits their needs (and particularly their economic needs).

29. In sum, Cleveland Hair has further established an appropriate likelihood of success on its contention that to the extent that it has or had any obligations in or with respect to patient records, or any obligations to Puig Group and its doctors, it has complied with them. Among other things, Cleveland Hair has proved without contradiction that it has reasonably complied with patient requests for medical records.

*Inadequate Remedy at Law and Irreparable Injury*

30. Cleveland Hair has no adequate remedy at law, for injunctive relief is essential to its survival. Any potential recovery of damages cannot adequately address the harm that it has sustained and continues to sustain, as well as holding out the prospect of nothing more than a hollow Pyrrhic victory. Its harm that it will suffer absent the entry of a preliminary injunction cannot be prevented or remedied by a final judgment (whether for money or for permanent injunctive relief or both) after a trial on the merits. Cleveland Hair's very ability to survive is currently threatened, and any damage award that this Court may ultimately enter pursuant to a final judgment order after a trial on the merits almost certainly will come too late to save Cleveland Hair's business, even as-

suming that defendants could or would pay it.

31. In support of what has just been said, Puig Group's breach of contract (the wrongful termination of the Agreement) and defendants' other unlawful conduct caused the elimination of the source of all of Cleveland Hair's revenues. While Cleveland Hair has since begun to develop relationships with other doctors, it has been unable to obtain new revenue sources sufficient to generate revenues that will permit it to continue operating at a level even remotely approaching the levels that existed prior to June 24. That is shown by a comparison between the level of activity at the Rosemont office during the months of July and August 1996 and the level of activity there during the same months in 1995 (Malmin Dep. Ex. 12). Cleveland Hair is also still not affiliated with any doctor qualified to perform the Brandy Flap procedure in Rosemont, and its operating room specifically outfitted (at Puig's request) for that purpose is not being utilized (Leonhard Dep. 310–15).

32. Moreover, Puig Defendants' wrongful conduct continues unabated. As examples, Puig Defendants continue to reserve Puig Group's right to enforce restrictive covenants in agreements between Puig Group and doctors who worked at Cleveland Hair's facilities, thus preventing those doctors from returning to Cleveland Hair (Puig Dep. 427–33); [17] through at least August 1996 Puig Group continued to use marketing materials for which Cleveland Hair had a copyright (the current situation in that respect is not fully verified) (Puig Dep. 433–36); Puig is interfering with the rights of former Cleveland Hair employees to return to work at Cleveland Hair (Puig Dep. 422–26); and Puig is interfering with Cleveland Hair's efforts to retrieve its owned equipment in the possession of Shear Point, the Cleveland Hair affiliate in Detroit.

33. Cleveland Hair's loss of future customers and revenues, as well as its loss of goodwill, is an irreparable injury for which injunctive relief is appropriate. As our Court of Appeals put that concept in *Hyatt Corp. v. Hyatt Legal Services*, 736 F.2d 1153, 1158 (7th Cir.1984), quoting this Court's opinion in *Instrumentalist Co. v. Marine Corps. League*, 509 F.Supp. 323, 333 (N.D.Ill.1981) (though voiced in a different context, the principle applies here with equal force):

> Such an injury would be remarkably difficult to convert into damages. "[T]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door or to identify the specific persons who do not [return] because of the existence of the infringer."

All that is needed to translate that into the matrix of this case is to substitute "wrongful conduct of defendants" for "existence of the infringer." And to that same effect, see such cases as *Storck USA, L.P. v. Farley Candy Co.*, 785 F.Supp. 730, 735–36 (N.D.Ill.1992).

34. Thus defendants' argument that damages can be calculated after the fact by comparing future results with past years' results misses the mark entirely. First, Cleveland Hair has a right to remain in business and, as already found, it is very unlikely that it will be able to do so in the absence of preliminary injunctive relief. Defendants' conduct has required Cleveland Hair effectively to start over, without doctors, without an experienced support staff and without the revenues needed to advertise to attempt to rebuild its business. Second, monetary damages will be extraordinarily difficult if not impossible to ascertain with any degree of reliability.[18] Among many other factors, the evidence shows that the hair transplant business is subject to many competitive and other variable conditions that make year-to-year comparisons imprecise as a benchmark for measuring damages. Here new variables have been

---

**17.** Those doctors include Dr. Mangubat, the Puig Group doctor who performed the Brandy Flap procedure at the Rosemont facility.

**18.** It is recognized of course that where a defendants' wrongdoing has made the proof of damages difficult, defendant must bear the risk of uncertainty in that respect. But that prospect cannot fully compensate for the problems described in the text.

introduced by Puig Group's improper termination and by the measures that Cleveland Hair has been forced to take in an effort to survive. While the Hearing produced no evidence demonstrating that the doctors with whom Cleveland Hair has entered into relationships after June 24 are not capable of rendering services of a quality at least equal to that offered by Puig Group doctors, Puig and Haenschen vigorously maintain that those doctors do not measure up to Puig Group's standards and are not capable of rendering comparable services (so that Puig and Haenschen are hard put to argue otherwise to show the purported adequacy of Cleveland Hair's damages remedy). Moreover, Cleveland Hair has had to hire and train new nurses and other staff members who are less efficient than the employees lured by Puig Group to leave Cleveland Hair and to join the new venture. In addition, one of the doctors now working at Cleveland Hair's facility also operates a separate hair transplant facility in Rosemont that competes with Cleveland Hair's facility. Hence Cleveland Hair does not have an exclusive claim to his services even at the Rosemont location (Malmin Dep. 462). In summary, all of those things confirm the unpersuasiveness of defendants' contention that a comparison of future results to those achieved in the past would be a reliable or predictable measure of damages.

35. Puig's own testimony confirms that he knew that Cleveland Hair would have difficulty in surviving if it did not accede to his "offer" that it abandon business operations in Rosemont, where the corporation had derived all or substantially all of its profits (Puig Dep. 383–87; *id.* 379–80). In fact, Puig's numerous activities were deliberately undertaken to see that Cleveland Hair would not survive.

*Balancing of Relative Harms*

■ 36. Cleveland Hair's already-identified harm that it would sustain if preliminary injunctive relief were wrongfully denied far outweighs any harm that defendants would suffer if such relief were to be wrongfully granted. Indeed, defendants will not be irreparably harmed by the entry of preliminary injunctive relief in any event.

37. No aspect of the preliminary injunctive relief sought by Cleveland Hair will preclude defendants from engaging in the practice of hair transplant procedures. Instead such relief principally:

(a) bars defendants from using the fruits of the parties' joint relationship other than in manner that will benefit both sides or at least not harm defendants inappropriately (thus the later-stated provisions will permit defendants to render services to any patient developed during that relationship at a facility not operated by Cleveland Hair if a written direction is provided by such a patient on a fully-informed basis, while the provisions will appropriately restrain defendants' enforcement of restrictive covenants to preclude doctors and employees who worked for Cleveland Hair or at a Cleveland Hair facility during that relationship from working at a Cleveland Hair facility now); and

(b) bars defendants from maintaining a facility without affording Cleveland Hair its contractual right (as defined in the Agreement) to manage such facility, Cleveland Hair having demonstrated that it has not been able to find an adequate replacement for Puig Group.

38. Defendants are presently conducting business out of a temporary facility. Puig testified that Puig Group has not committed to permanent arrangements pending the outcome of these proceedings. In any event, defendants could not reasonably have relied on the absence of any restrictions on their conduct in taking any actions in furtherance of their new venture, for the Complaint in this action was filed in advance of the effective date of the termination Notice, and the Complaint expressly alerted defendants to Cleveland Hair's intention to seek preliminary injunctive relief.

39. Although this may not equate fully to the current balancing-of-harm determination, Puig himself has conceded that the grant of injunctive relief as requested by Cleveland Hair will leave Puig Group far better off than defendants left Cleveland Hair as a result of the termination of the Agreement and defendants' related activity (Puig Tr. 9/18/96).

40. Given the already-demonstrated likelihood that Cleveland Hair will prevail on the merits, its burden in terms of demonstrating irreparable injury is not substantial. In that respect the "sliding scale" approach described in *Roland Machinery*, 749 F.2d at 387–88 strongly favors Cleveland Hair and disfavors defendants, because *both* of the weights placed in the scales—the likelihood of success on the merits and the balance of relative harms—tip so heavily toward Cleveland Hair.

*Public Interest Considerations*

41. As clarified in *Roland Machinery*, the long-recognized concept that preliminary injunctive relief must not "disserve the public interest" reflects the judicial concern whether "an order granting or denying a preliminary injunction will have consequences beyond the immediate parties" (749 F.2d at 388). In that respect no adverse public policy considerations are present here. Indeed, to the extent that there are any public interests present, they do not impact unfavorably upon the *Roland Machinery* analysis and upon the already-expressed factors calling for the grant of injunctive relief.

42. As conclusion 37 states, the relief sought by Cleveland Hair will not prevent defendants from practicing medicine. And no public policy considerations protect doctors against having to work under conditions that they may regard as non-optimal in financial terms, particularly where (as in this case) any arguably non-optimal conditions that would be imposed by a preliminary injunction stem from defendants' own wrongful acts.

43. Under Illinois law, public policy considerations do not preclude doctors from entering into restrictive covenant agreements (*Gillespie v. Carbondale & Marion Eye Ctrs., Ltd.*, 251 Ill.App.3d 625, 628, 190 Ill.Dec. 950, 953, 622 N.E.2d 1267, 1270 (5th Dist.1993), citing and relying on *Canfield v. Spear*, 44 Ill.2d 49, 254 N.E.2d 433 (1969)). If doctors (including defendants) can thus, by contracts designed to protect their own pecuniary interests, disqualify themselves from continuing to serve patients to whom they have previously rendered professional services, surely they may also be subjected to less onerous restrictions on their professional practices if they have engaged in illegal conduct and in the violation of duties owed to a third party such as Cleveland Hair, as has been demonstrated in this case.

44. To shift more expressly to "consequences beyond the immediate parties" (the *Roland Machinery* phrase), defendants have offered no evidence that any patients have been deprived of any treatment or care or of any access to their medical records. To the contrary, defendants' own testimony demonstrates that they regularly perform surgeries on patients without necessarily having the patients' files. Moreover, as already determined, Cleveland Hair has reasonably complied with any patient requests for files. Finally, the undisputed evidence that defendants had never requested patient files from other non-Puig Group physicians who had treated patients on whom defendants later performed further hair transplant procedures demonstrates that the patient files are really being sought by defendants to garner a competitive advantage, and not to protect patient interests or rights.

*Other Equitable Considerations*

45. Cleveland Hair's entitlement to relief is unaffected by any notion that it comes to this court of equity with "unclean hands." Any assertions by defendants to the effect that Cleveland Hair engaged in unclean-hands conduct have not been supported in evidentiary terms.

46. Even if defendants had offered evidence that Cleveland Hair has engaged in what defendants would characterize as unclean-hands conduct, Cleveland Hair would still not be foreclosed from obtaining preliminary injunctive relief because:

(a) such asserted conduct related to the manner in which Cleveland Hair has conducted its business in the wake of defendants' wrongful conduct and is hence not "in connection with the very transaction complained of" (*Polk Bros., Inc. v. Forest City Enter., Inc.*, 776 F.2d 185, 193–95 (7th Cir.1985); *American Hosp. Supply Corp. v. Hospital Prods., Ltd.*, 780 F.2d 589, 600–01 (7th Cir.1986));

(b) defendants cannot bar Cleveland Hair from obtaining injunctive relief because of what Cleveland Hair did as a reasonable response to defendants' wrongful acts; and

(c) there is no evidence that Cleveland Hair did anything with malicious intent or in bad faith (*RTA v. Burlington N., Inc.,* 100 Ill.App.3d 779, 786, 55 Ill.Dec. 818, 823, 426 N.E.2d 1143, 1148 (1st Dist.1981)).

47. Cleveland Hair urges that preliminary injunctive relief is also warranted as a sanction for the bad faith conduct of defendants and their prior lawyers, a subject dealt with in Sanctions Opinion 1 and in its sequel issued on November 20. It adduces some support for such an approach (see *Associates Fin. Servs. Co. v. Mercantile Mortgage Co.,* 727 F.Supp. 371, 375 (N.D.Ill.1989)). But though that might serve as an independent predicate for such relief, the relevant factors so strongly support Cleveland Hair's position that this Court need not address that alternative.

*Security*

48. Puig admits that Puig Group is indebted to Cleveland Hair (Puig Dep. 407). While this Court has not yet heard evidence on the amount of that debt, Cleveland Hair has represented that it is in excess of $150,-000, and defendants have not presented any evidence that a lesser amount is owed. Moreover, defendants (as well as Tinaglia) are jointly and severally liable to Cleveland Hair in a very substantial amount as a result of this Court's sanctions opinions.

49. Defendants' retention of the amount owed to Cleveland Hair constitutes far more than sufficient security for the entry of the preliminary injunction sought by Cleveland Hair, thus conforming to Rule 65(c) and also obviating any need to resort to Rule 65.1 (*Illinois Hosp. Ass'n v. Illinois Dep't of Public Aid,* 576 F.Supp. 360, 372 (N.D.Ill.1983)).

\*    \*    \*    \*    \*    \*

Based on the foregoing Findings and Conclusions, IT IS HEREBY ORDERED that pending any further order of this Court all defendants and their respective officers, agents, servants, employees and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this order by personal service or otherwise, are enjoined and restrained:

1. from selling or disseminating to others any information gained during the existence of the Cleveland Hair–Puig Group relationship, including client information, client lists, appointment books, marketing information, addresses, telephone numbers, information obtained from the database to which defendants had access during that relationship with Cleveland Hair and all other similar information, and also from using any such information themselves except in accordance with Paragraph 4;

2. from establishing or maintaining any office or facility at which hair transplant procedures are performed or offered without affording Cleveland Hair the option to establish and manage such facility for Puig Group, as more particularly set forth in Section 2 of the Agreement (as defined in Finding 8);

3. from hiring or soliciting for hire any of Cleveland Hair's employees, or from enforcing any existing employment agreement or other contract with persons formerly employed by Cleveland Hair to prevent those persons from working for Cleveland Hair or at one of its facilities either part-time or full-time;

4. from treating or rendering services to any person to whom services were previously rendered in a Cleveland Hair facility, or who was identified, solicited or communicated with as a prospective client during the existence of the Cleveland Hair–Puig Group relationship, or from collecting deposits or fees for such services, except:

(a) at a facility operated and managed by Cleveland Hair, with all revenues derived therefrom being handled in a manner consistent with the practices followed by the parties before the service of the termination Notice; or

(b) if not in accordance with Subparagraph 4(a), then with Cleveland Hair's express permission; or

(c) if not in accordance with Subparagraph 4(a) or 4(b), then after receipt of a

written direction from the person involved following the delivery to that person of written materials from both Cleveland Hair and Puig Group, each describing the respective services that it offers to provide or to make available to such person;

5. from enforcing any restrictive covenant or other agreement to which Puig Group is a party to prevent any person or firm from entering the employ of or from otherwise contracting with Cleveland Hair;

6. from using any promotional and other materials generated or prepared during the Cleveland Hair–Puig Group relationship, whether or not copyrighted, including excerpts from or altered versions of such materials (e.g., altered to delete or replace references to Cleveland Hair), including but not limited to brochures, video tapes, advertisements and other promotional materials;

7. from obtaining credit, financing or any other economic benefit based on financial or other information of or about Cleveland Hair, except to the extent that such financial information directly reflects the separate operations of Puig Group;

8. from filing or threatening to file lawsuits *in any other form* against Dr. Robert Thomas (who had been named as a defendant in Haenschen's state court lawsuit), or against any employees of or other doctors or other persons associated with Cleveland Hair, with respect to matters or issues before this Court, including but not limited to any issues related to medical records or patient files;

9. from otherwise threatening or harassing any present or former employee of Cleveland Hair or any doctor or other person who formerly worked at Cleveland Hair's facilities or with whom it has had a relationship; or

10. *from interfering with or inducing* the breach of any employment or other written or oral agreement to which Cleveland Hair is a party, including but not limited to any agreement containing restrictive covenants imposing restrictions on Cleveland Hair employees.

This action is set for a further status hearing at 9:30 a.m. November 27, 1996.