TLC THE LASER CENTER, INC., *et al.*, Plaintiffs-Appellants, v. MIDWEST EYE INSTITUTE II, LTD., *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—98—2648

Opinion filed June 15, 1999.—Rehearing denied August 6, 1999.

Daniel P. Hogan, Donald C. Pasulka, and George J. Spathis, all of Ross & Hardies, of Chicago, for appellants.

Matthew M. Neumeier, Norman M. Hirsch, and Theodore T. Eidukas, all of Jenner & Block, of Chicago, for appellees.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)), plaintiffs TLC The Laser Center, Inc. (TLC, Inc.), and TLC Midwest Eye Laser Center, Inc. (TLC-Midwest) (collectively, TLC or plaintiffs), appeal from the trial court's entry of partial summary judgment in favor of defendants. The court determined that TLC did not possess a "protectable interest" which would support a claim for a preliminary injunction. For the reasons given below, we affirm.

## FACTS

On January 20, 1998, TLC filed an 11-count verified complaint against defendants. It sought injunctions under section 15 of the Trademark Registration Act (also known as the Anti-Dilution Act) (765 ILCS 1035/15 (West 1994))[1] and the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/1 et seq. (West 1994)) (counts I and II); and under restrictive covenants contained in written "Confidenti-

---

[1] The parties consistently refer to section 15 of the Trademark Registration Act (765 ILCS 1035/0.01 (West 1994)) by the commonly used moniker of the Anti-Dilution Act. See Kern v. WKQX Radio, 175 Ill. App. 3d 624, 625, 529 N.E.2d 1149, 1150 (1988). To avoid confusion we shall do the same.

ality and Non-Competition Agreements" between defendants and plaintiffs (count IV). In addition to injunctive relief plaintiffs also sought monetary damages for common-law unfair competition (count III), breach of contract (count V), unjust enrichment (count VI), tortious interference with contractual relations (count VII), breach of fiduciary duty (count VIII), inducement of breach of fiduciary duty (count IX), tortious interference with prospective business relations (count X), and conversion (count XI). None of the monetary damage counts are before us on this appeal, however.

According to the complaint defendants Herman D. Sloane, M.D., and Allen M. Pielet, M.D., are ophthalmologists practicing in Illinois. Prior to December 1996, Sloane, Pielet and five other ophthalmologists with whom Sloane and Pielet shared facilities at Midwest Eye Institute, Ltd. (MEI), in Palos Heights, Illinois, and Midwest Eye Institute II, Ltd. (MEI II), in Westchester, Illinois, were managing their practices and facilities without administrative support. However, in December 1996 TLC purchased "substantially all of the nonprofessional assets of MEI and MEI II from its [sic] shareholders, including Sloane and Pielet." Among the assets purchased were the leasehold interests in the MEI and MEI II facilities and all "rights, title and interest in and to the tradenames 'Midwest Eye Institute, Ltd.' and 'Midwest Eye Institute II, Ltd.' " The precise provisions of the transaction were memorialized in a document entitled "asset purchase agreement," which was attached as an exhibit to the complaint.

Shortly thereafter, in January 1997, Sloane and Pielet entered into a "confidentiality and non-competition" agreement with plaintiffs. The noncompetition agreement, a copy of which was also attached as an exhibit to the complaint, provided in relevant part:

"During the two (2) years after the date hereof, the Covenantors [(Sloane and Pielet)] shall not, without the prior written consent of Companies [(TLC)], provide excimer laser surgical professional or technical services within a 30 mile radius of the Premises. For purposes of this Agreement 'Premises' shall include MEI II's facility [in] Westchester, Illinois and MEI's facility [in] Palos Heights, Illinois. The parties hereto acknowledge and agree that the cove-

We note at this point that the entire Trademark Registration Act, including the Anti-Dilution Act, was repealed effective January 1, 1998, 19 days before the complaint in this case was filed. Pub. Act 90—231, § 905, eff. January 1, 1998. In its place the legislature enacted the Trademark Registration and Protection Act (Pub. Act 90—231, § 90, eff. January 1, 1998; 765 ILCS 1036/1 et seq. (West Supp. 1997)). We shall discuss in the text the effect this change has on the case sub judice.

nant contained herein shall not be effective if the Covenantors terminate the Practice Administrative Service Agreement between Covenantors and TLC Midwest pursuant to the terms of Section 8.3 of that Agreement."

The "Practice Administrative Service Agreement" (service agreement) to which the noncompetition agreement referred was also attached to the complaint. This document provided that TLC would train Sloane and Pielet to perform excimer laser surgery at TLC's expense and would equip the Westchester facility to perform excimer laser surgery. According to the complaint, excimer laser surgery is different from traditional ophthalmological practice, in that, rather than treating an ocular disease, excimer surgery is elective and is designed to improve the vision of persons with otherwise healthy eyes. The complaint alleged that "neither MEI nor MEI II had excimer laser technology service and performed relatively few excimer laser procedures" prior to 1997.

In the service agreement TLC also licensed to Sloane and Pielet's practice the right to operate under the name "Midwest Eye Institute" (which name TLC had obtained the rights to in the asset purchase agreement). Sloane, Pielet, and the practice covenanted in return:

"During the term of this Agreement and for a period of two (2) years after the termination of this Agreement for any reason other than termination pursuant to Section 8.3 hereof, the Practice and the Surgeons shall not, without the prior written consent of TLC Midwest within a 30-mile radius of each site of the Premises provide excimer laser surgical professional or technical services at any location other than the Premises."

Sloane, Pielet, and their practice also agreed:

"The Practice and the Surgeon acknowledge and agree that TLC is entitled to prevent the disclosure of Confidential and Proprietary Information.[2] The Practice and the Surgeon agree at all times during the term of this Agreement and thereafter to hold in strict-

---

[2]"Confidential and Proprietary Information" was defined by the service agreement as:

"all trade secrets and other confidential and/or proprietary information of TLC Group, including information derived from reports, investigations, research, work in progress, codes, marketing and sales programs, financial projections, cost summaries, pricing formula, contracts analyses, financial information, projections, confidential filings with any state or federal agency, and all other confidential concepts, methods of doing business, ideas, materials or information (other than the Practice's and the Surgeon'[s] original patient records) prepared or performed or, [sic] by or on behalf of TLC Group, including by the TLC Group on behalf of the Practice in connection

est confidence and not to disclose to any person[,] firm or coopera-
tion [sic], other than to Practice Professional Employees, to Physi-
cian Resource Group, Inc. and its affiliates and persons engaged by
TLC Midwest to further the business of the Practice, and not to
use except in the pursuit of the business of TLC Group, Confidential
and Proprietary Information, without the prior written consent of
TLC Midwest; unless (i) such information becomes known or avail-
able to the public generally through no wrongful act of the Practice
or the Surgeon or its employees, (ii) disclosure is required by law
or the rule, regulation or order of any governmental authority
under color of law, provided, that prior to disclosing any Confiden-
tial and Proprietary Information pursuant to this clause (ii), the
Practice and the Surgeon shall, if possible, give prior written notice
thereof to TLC Midwest and provide TLC Midwest with the op-
portunity to contest such disclosure, or (iii) the Practice and the
Surgeon reasonably believe that such disclosure is required in con-
nection with a lawsuit to which the Practice or the Surgeon is a
party."

Plaintiffs agreed to furnish the practice with services incident to the
medical practice (including, e.g., purchasing, billing, bookkeeping) and
to advance to the practice sufficient funds to pay all expenses.
However, Sloane and Pielet retained sole and exclusive control of "all
aspects of their practice of medicine and the delivery of medical ser-
vice at the TLC Facilities." Sloane and Pielet agreed to compensate
plaintiffs for their services and repay advances and agreed that for a
period of five years they would not transfer their shares of the practice
nor would they terminate it. They also covenanted to work no fewer
than 25 hours per week at TLC.

Section 8.3 of the service agreement, which was referred to in the
restrictive covenants contained in the service agreement and the non-
competition agreement, allowed Sloane, Pielet and the "Practice"
(MEI II) to terminate the service agreement if either of two things
happened: TLC's insolvency or a material breach of the service agree-
ment by TLC (if such breach continued for more than 60 days after
written notice thereof).

The complaint alleged that Sloane and Pielet began to conspire to
"break away from TLC Midwest Eye Institute" in or about the early
summer of 1997. According to plaintiffs, in the fall of 1997 Sloane and
Pielet reduced the number of hours they worked at TLC without legit-
imate reason (including an alleged feigned hand injury by Sloane) in
order to "create a backlog of patients scheduled for excimer laser

herewith, by its employees, officers, directors, agents, representatives, or
consultants."

surgery in an effort to divert patients" to a new facility Sloane and Pielet opened in December 1997 under the name "Midwest Eye Physicians." TLC alleged that in December 1997 Sloane and Pielet served TLC with written notice of the practice's cancellation of the service agreement and induced other TLC employees, including defendants Ronald Carr and Dominick Opitz, to purge records from the TLC facility's files, secrete TLC's confidential and proprietary information, and remove equipment and nonmedical supplies that either belonged outright to TLC or were subject to a security interest held by TLC. According to the complaint, Carr and Opitz were at the time employed by TLC as directors of clinical services at the Palos Heights and Westchester facilities, respectively.

As previously noted, plaintiffs brought suit against defendants on a variety of theories, but this appeal concerns solely counts I, II, and IV of the complaint. In count I plaintiffs sought to enjoin defendants from violating the Illinois Anti-Dilution Act (765 ILCS 1035/15 (West 1994)). Plaintiffs contended that their tradename of "Midwest Eye Institute" was distinctive and that defendants' use of the name "Midwest Eye Physicians" (MEP) was intended to confuse patients and referring physicians and threatened "economic injury and damage to TLC's goodwill and business reputation which has become intertwined with the reputation and market success of its excimer laser practice." Similarly, count II of the complaint sought an injunction against defendants based on the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/1 et seq. (West 1994)). Plaintiffs contended that defendants had willfully and intentionally acted so as to bring about a "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services" which had caused TLC "irreparable harm" and would continue to do so unless enjoined.[3] Finally, count IV of the complaint sought an injunction based on the restrictive covenants contained in the noncompetition agreement and the service agreement. Plaintiffs contended that defendants violated the covenants by (1) practicing excimer laser surgery within the restricted territory within the restricted time; and (2) "on information and belief," using and/or disclosing TLC's confidential and proprietary information in their formation and operation of MEP.

---

[3]Count III of the complaint also involved defendants' use of the name "Midwest Eye Physicians." However, in count III plaintiffs requested damages (rather than an injunction) because defendants' use of the name allegedly constituted the common law torts of infringement of trade name and unfair competition. The trial court did not enter summary judgment for defendants on count III, and accordingly that count is not before us on this appeal.

In January 1998, within the same month as the complaint was filed, plaintiffs filed a motion for a temporary restraining order and a preliminary injunction. Claiming "substantial and irreparable injury" to its business, TLC requested the court to enjoin Sloane, Pielet, and MEI II from breaching the noncompetition agreement and enjoin Sloane, Pielet, MEI II and MEP from using the trade name "Midwest Eye Physicians" (or any similar "derivative of 'Midwest Eye Institute' ") or otherwise violating the Anti-Dilution and Deceptive Trade Practices Acts.

The court denied plaintiffs' request for a temporary restraining order on the basis that plaintiffs had failed to "establish a protectible [sic] right or interest in enforcing the restrictive covenants at issue." Plaintiffs did not appeal from this order. The court stated at the hearing at which that order was issued that it had not decided the merits of the preliminary injunction by its decision not to grant a temporary restraining order. It directed the parties to brief the issue whether plaintiffs had a protectable interest before it conducted a hearing on the request for a preliminary injunction.

In accordance with the court's direction, plaintiffs moved for a "summary determination" that they possessed a protectable interest, and defendants countermoved for summary judgment in their favor on the basis that plaintiffs had no protectable interest. The parties filed legal memoranda together with extrinsic submissions in support of their respective positions. In support of their motion for summary determination, plaintiffs submitted affidavits by Kenneth F. Wong, senior director of operations for TLC; Duane Morrison, TLC's regional general manager for the Midwest, Rocky Mountain states and California; Janine Charland, general manager of TLC-Midwest; and Cathy Graziano, the business manager of TLC-Midwest. Defendants, in turn, submitted copies of their agreements with plaintiffs; two affidavits by Sloane; an affidavit by attorney Kenneth Harris; schedule 3.1 to the asset purchase agreement; and schedule 6.1 to the practice management agreement. (No schedules were included in the copies of the agreements that were attached to the original complaint.)

The Wong affidavit, submitted by plaintiffs, concerned costs that TLC had and would continue to incur. Wong stated that a TLC excimer laser center required several unique rooms and specialized equipment. The average "build out cost" for a new facility was $70 per square foot; generally at least 3,500 to 4,000 square feet of usable space was required, or 6,500 square feet if the facility was also to house a facility for non-excimer laser procedures. Wong admitted that TLC was required to make relatively few modifications to the Westchester property, however; the only cost he detailed was the re-

moval of one wall at a cost of $4,300. He stated that TLC was required to make a heavy capital investment in the equipment required to perform excimer laser procedures. Wong stated that the laser alone cost approximately $500,000, and other associated equipment (including a microkeratome, an air purifier, and a specialized cooling unit) cost an additional $95,000. TLC also purchased yearly maintenance contracts for the equipment at a price of approximately $47,000 per year.

Wong stated that TLC would incur substantial losses if it were forced to relocate from the Westchester office. To move the specialty equipment from the Westchester office would cost between $3,000 and $10,000, depending on the distance of the move; he also stated that it would be "extremely unlikely" that TLC could find a subtenant for its lease because of the special cooling equipment, wiring, layout, millwork and plumbing in the facility. He anticipated that TLC would lose at least $600,000 on the lease if it were forced to relocate.

Morrison stated in his affidavit that because there was a very low rate of utilization of excimer laser procedures (he stated that only 2% of the near-sighted population was expected to undergo corrective laser surgery within the next 5 to 10 years), a population base of at least 500,000 people and 100 to 150 referring physicians was required to sustain a center. Morrison stated that in addition to the laser center defendants were establishing in Palos Heights, there were already four other such operations in the Chicagoland area.

Charland's affidavit explained the operations of TLC. Charland stated that throughout its course of operations, TLC had developed a number of techniques for "managing, marketing and promoting a corrective laser surgery practice and center" which were "not generally known outside of TLC." Charland stated that TLC had hired and trained a number of employees at the Westchester office who, on information and belief, were then working for defendants. She stated that according to TLC procedures the patient only met the surgeon on the date of the surgery, before which the patient had met and had substantial interaction with TLC staff. Accordingly, she contended, TLC "develops a significant amount of 'good will' of its own with patients and referring eye care professionals."

TLC's final submission was the affidavit of Graziano, which concerned defendants' alleged misappropriation of TLC files. Before being employed by TLC, Graziano had been employed by defendants for approximately six years. She stated that before defendants' departure from TLC, TLC had regularly reviewed patient charts in the course of its business in order (in part) to generate a list of optometrists who referred patients to TLC. She averred that the

defendants, upon their departure, had "removed the vast majority of the patient files from the TLC facilities, and those files are no longer available for review to determine the source of many patient referrals." Graziano stated that after review of the list of referring optometrists and based upon her familiarity with defendants' referring optometrists through her previous employment, she believed that TLC's marketing efforts added seven optometrists to the group who were referring patients to defendants.

As noted, among defendants' submissions were two separate affidavits by Sloane.[4] In the first of those affidavits Sloane stated that before he and Pielet were ever approached by TLC he (Sloane) already had "extensive training in excimer laser surgery *** and had substantial experience in that area." Sloane also stated that when he and Pielet entered into their relationship with TLC, they sold only "nonmedical, nonprofessional assets to TLC—assets such as tables, computers, facility leases, etc." Sloane emphasized that he and Pielet did not sell TLC their practice or their patient records. He also noted that although TLC represented that it had expended more than $1.5 million to purchase the nonmedical assets of the practice, he and Pielet received "less than approximately $20,000."

The second Sloane affidavit was essentially a response to the Charland affidavit. Sloane averred that the persons to whom Charland referred were employees of his and Pielet's practice, not employees of TLC, and to the extent TLC sought to employ the persons directly, it was in breach of the practice management agreement. Sloane also stated that under the practice management agreement he and Pielet were charged for all of the services those personnel performed, "including" their salaries. Moreover, Sloane stated that neither he nor Pielet "raided" TLC's staff. According to Sloane, the persons identified by Charland worked for Sloane's and Pielet's practice while they were affiliated with TLC and chose to stay with them "without any solicitation or pressure from Dr. Pielet or myself."

Regarding Charland's contentions concerning the confidential nature of TLC's "marketing, management or promotional information," Sloane stated that any such information to which he and Pielet were exposed or made aware was general in nature, contained no

---

[4]The two affidavits were attached to different submissions by defendants. While Sloane's initial affidavit was attached to defendants' motion for summary judgment, his second affidavit was attached to a separate memorandum defendants filed in opposition to plaintiffs' motion for summary determination and, as will be noted in the text, was primarily a rebuttal of the Charland affidavit upon which plaintiffs relied.

unique approaches, and was not treated as confidential by TLC. Sloane stated that the "contents of TLC's marketing and promotional materials, such as letters, brochures, internet sites, print advertising, and direct mailings were publicly disclosed," and contended that anyone who entered TLC's clinics "could observe the way in which TLC's 'staff' was assigned and organized." Finally, Sloane stated that neither he nor Pielet was "using any of the marketing, management, or promotional information described in Ms. Charland's affidavit *** in our current practice, and we have no intention of doing so in the future."

Attached to Sloane's second affidavit was what he represented to be a true and correct copy of the February 1998 edition of TLC-Midwest's newsletter. In this document was an article which stated that TLC had found three ophthalmologists to replace himself and Pielet at the Westchester and Palos Heights facilities. The article stated that Sloane's and Pielet's termination of their contract "did not come as a complete surprise," although it contended that TLC-Midwest had been "given no formal notice."

The other affidavit defendants submitted was by attorney Kenneth Harris. Harris averred that the results of a search by Jenner & Block's corporate clerk revealed that, in addition to the litigants in this action, several other corporate entities registered with the Illinois Secretary of State used the phrase "Midwest Eye" in their names. He stated that a search of telephone listings "produced similar results." Copies of the searches were attached to the affidavit.

As noted, in addition to these three affidavits defendants also submitted copies of two schedules to their agreements with plaintiffs. The first was schedule 3.1 to the original asset purchase agreement. This document, entitled "Allocation of Purchase Price," states that the price paid for "Goodwill" was $1. The other schedule was schedule 6.1 to the practice management agreement, which established the annual fee defendants were required to pay plaintiffs over and above reimbursement for expenses. The document reveals that the annual fee depended on the total revenues plaintiffs generated in the year, according to a table:

| Revenues for Year | Annual Fee |
| --- | --- |
| $0 to $999,999 | $ 200,000 |
| $1,000,000 to $1,333,332 | $ 300,000 |
| $1,333,333 to $1,666,665 | $ 400,000 |
| $1,666,666 to $1,999,999 | $ 500,000 |
| $2,000,000 to $2,499,999 | $ 650,000 |

| | |
|---|---|
| $2,500,000 to $2,999,999 | $ 800,000 |
| $3,000,000 to $3,999,999 | $1,100,000 |
| $4,000,000 to $4,999,999 | $1,400,000 |
| $5,000,000 to $5,999,999 | $1,700,000 |
| $6,000,000 to $6,999,999 | $2,000,000 |
| $7,000,000 to $7,999,999 | $2,200,000 |
| $8,000,000 to $8,999,999 | $2,500,000 |
| $9,000,000 to $9,999,999 | $2,800,000 |
| $10,000,000 and over | $3,000,000. |

Defendants contended this constituted an improper fee-splitting arrangement, which rendered the practice management agreement void and also voided the restrictive covenants, which defendants asserted "expressly provide that they are terminated if the Surgeons properly terminate the PMA."

In March 1998 the court denied plaintiffs' motion and granted defendants' motion, entering judgment in defendants' favor on counts I, II and IV of the complaint. By order of July 16, 1998, the court found that there was "no just reason to delay enforcement or appeal of this Court's March 20, 1998 Order granting partial summary judgment in favor of the defendants with respect to Counts I, II and IV of Plaintiffs' Complaint."[5] This appeal followed.

Plaintiffs contend that the circuit court erred in granting partial summary judgment to defendants. Plaintiffs assert that the court's ruling was based on a determination that they could not establish a protectable interest, and suggest that this conclusion was erroneous because TLC had a legitimate protectable interest in (1) the investment it made in acquiring defendants' assets and transforming the offices into an excimer laser center; (2) the trade name and good will it purchased from defendants and promoted by expending additional funds; and (3) its trade secrets and other confidential information which it revealed to defendants during the parties' association. Defendants claim that the trial court properly granted partial summary judgment because (1) TLC has no protectable interest; (2) any interest which TLC might claim to have would be unenforceable

---

[5]Plaintiffs attempted to take an appeal from the March order pursuant to Supreme Court Rule 307(a)(1) (166 Ill. 2d R. 307(a)(1)), characterizing the order as one which refused an injunction. In June 1998 this court dismissed plaintiffs' appeal for lack of jurisdiction. *Laser Center v. Midwest Eye Institute*, No. 1—98—1335. Accordingly, plaintiffs returned to the circuit court in order to request that the court enter a finding that there was no just reason to delay enforcement or appeal.

because of the Illinois prohibition on the "corporate practice of medicine"; (3) the restrictive covenants are unenforceable because they are part of a contract which is void because it violates the Illinois Medical Practice Act of 1987 (225 ILCS 60/1 *et seq.* (West 1994)) by creating a "fee-splitting" arrangement; (4) the requested relief—precluding defendants from practicing excimer laser surgery—is unrelated to plaintiffs' purported interest in protecting their trade secrets; and (5) the Anti-Dilution Act claim fails because plaintiffs' trade name is not distinctive and plaintiffs are not entitled to proceed under the "statutory injunction rule."

## ANALYSIS

■ Our review of a summary judgment is *de novo*. We may affirm the trial court's decision on any basis apparent from the record. *Frost v. Robave, Inc.*, 296 Ill. App. 3d 528, 532, 694 N.E.2d 581, 583-84 (1998).

## I. CORPORATE PRACTICE OF MEDICINE

Defendants initially suggest that the trial court's entry of judgment in their favor may be upheld because plaintiffs' only interest which would be protected by the injunctions they requested would be an interest in practicing medicine, which a corporation cannot do unless licensed as a hospital. See *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 688 N.E.2d 106 (1997). For the reasons stated below, we disagree that all of plaintiffs' protectible interests violate the "corporate practice of medicine" doctrine.

■ There is no dispute that plaintiffs TLC, Inc., and TLC-Midwest do not hold medical licenses in the State of Illinois, nor could they do so. " 'The legislative intent manifest from a view of the entire [Medical Practice Act] is that only individuals may obtain a license thereunder. No corporation can meet the requirements of the statute essential to the issuance of a license.' " *Berlin*, 179 Ill. 2d at 13, 688 N.E.2d at 111, quoting *People ex rel. Kerner v. United Medical Service, Inc.*, 362 Ill. 442, 454, 200 N.E. 157 (1936). Accordingly, plaintiffs cannot successfully contend that they have a protectable interest in practicing medicine.

Plaintiffs admit this to be the case but disavow any intention to "practice medicine" in competition with defendants. Rather, plaintiffs contend that they have other legitimate business interests which suffice to support the injunctive relief they request and which do not constitute the corporate practice of medicine. Specifically, they contend that they are seeking to protect their interests in (1) their investment in acquiring the defendants' assets, including the leasehold estate, and in transforming the facilities into an excimer laser center; (2) the

trade name and good will which they purchased from defendants and have "promoted and expanded through their significant investment in reliance upon" the restrictive covenant; and (3) protecting trade secrets and other confidential information which plaintiffs contend they divulged to defendants during the course of their business relationship.

Plaintiffs cite to no Illinois appellate decisions in their favor, but rely on *Cleveland Hair Clinic, Inc. v. Puig*, 968 F. Supp. 1227 (N.D. Ill. 1996). Defendants purport to rely on the decisions in *Berlin* and *Dr. Allison, Dentist, Inc. v. Allison*, 360 Ill. 638, 196 N.E. 799 (1935). In *Cleveland Hair* the plaintiff, Cleveland Hair, was a corporation in the business of operating hair transplant facilities across the nation. Puig and a fellow defendant, Hanschen, were doctors of osteopathic medicine who specialized in hair transplant procedures. They performed those procedures, which had to be performed by a medical doctor, for Cleveland Hair, at Cleveland Hair's facilities. Cleveland Hair and Puig Group (a professional service corporation formed by Puig to engage in the practice of medicine, of which Puig was the sole shareholder) had a written agreement which granted Puig Group the exclusive right to perform hair transplant procedures at Cleveland Hair facilities and gave Cleveland Hair the right to manage the facilities at which Puig Group performed such procedures. Cleveland Hair was required to furnish all of the facilities, employ all nonphysician personnel, and perform all management and support services. Puig severed his relationship with Cleveland Hair upon 30 days' notice, as allowed by the agreement.

The court found all defendants acted wrongly and granted Cleveland Hair a broad preliminary injunction.[6] Most relevant to the instant case, the court determined that Cleveland Hair was entitled to compete with Puig Group. *Cleveland Hair*, 968 F. Supp. at 1245, citing *Galinski v. Kessler*, 134 Ill. App. 3d 602, 610-11, 480 N.E.2d 1176, 1182-83 (1985). The court qualified its use of the term "competitor," stating:

" 'Competitor,' as a term applicable to Cleveland Hair, should be

---

[6]The *Cleveland Hair* court enjoined defendants from, *inter alia*: selling or disseminating any information gained during the relationship between Cleveland Hair and Puig Group; establishing any hair transplant office or facility without giving Cleveland Hair the option of establishing and managing the facility; hiring or attempting to hire any Cleveland Hair employee or preventing any former Cleveland Hair employee from working for Cleveland Hair; and treating any former or prospective Cleveland Hair client at a non-Cleveland Hair facility without Cleveland Hair's permission or the client's express direction. *Cleveland Hair*, 968 F. Supp. at 1250-51.

understood \*\*\* not as any entity seeking to deliver the physical hair transplant services itself (something that Cleveland Hair concededly cannot do, for such services may be provided only by doctors), but rather as an entity able to develop an organization by affiliating with doctors in the same way as (or in a way similar to) its Agreement with Puig Group, so that Cleveland Hair's ability to contribute its skills and abilities to the total venture—and its corresponding ability to use its facilities—will not be lost or destroyed." *Cleveland Hair*, 968 F. Supp. at 1240 n.13.

■ We find *Cleveland Hair* persuasive and, as shall be more fully discussed below, we find inapposite the Illinois decisions of *Berlin* and *Dr. Allison*, upon which defendants purport to rely. Sloane and Pielet do not contend that their initial relationship with TLC constituted the corporate practice of medicine (nor would we so find if they had so argued, as we will discuss momentarily), and there would appear to be no reason that TLC would be precluded from entering into a similar arrangement with another ophthalmologist or ophthalmologists.[7] The asset purchase agreement makes clear that TLC did not purchase Sloane's and Pielet's medical practices nor their patient files. The practice services agreement shows that TLC's responsibilities all fell under the rubric of administration. We see no basis to conclude that a company which solely provides administrative services to a physician or group of physicians is thereby engaging in the corporate practice of medicine.

■ If, as we conclude, this type of relationship does not constitute the corporate practice of medicine, then TLC had legitimate interests to protect. The affidavits TLC submitted in this case clearly establish a significant investment in the facilities and the potential for a large loss if TLC were unable to find another physician or physicians with whom to enter into a beneficial contract. It is uncontradicted that TLC has replaced Sloane and Pielet, but the affidavits support an inference that Sloane and Pielet's operation of the MEP facility in close proximity to the MEI facility, with such a similar name, will make TLC's arrangement less profitable, because of the relative infrequency with which excimer laser surgery is performed.

TLC has an interest in the viability of the practice of any ophthalmologists with whom it associates because if the practice fails TLC will presumably cease receiving payments for its services. Although, as we shall discuss below, the agreement in this case is

---

[7] However, if TLC were to associate with another ophthalmologist, it would be well advised to avoid the fee-splitting arrangement which, as we shall discuss in the next section of the analysis, rendered void the practice services agreement in this case.

unenforceable because it involves feesplitting, it would appear that even if no feesplitting was involved TLC would presumably make more money the more successful was the practice. In other words, TLC earns a profit on each staff person it provides to a medical practice, so an office with a staff of 30 personnel will provide TLC a greater return than a two-person office. Accordingly, TLC has a legitimate interest in precluding defendants from practicing in such close proximity to the practice to which TLC is providing support.

As previously noted, defendants argue that the Illinois decisions in *Berlin* and *Dr. Allison* compel a different result. We disagree. First, *Berlin* is inapposite because it did not address the effect of the prohibition against the corporate practice of medicine on the enforceability of a restrictive covenant. The only question the court decided with respect to that doctrine was that it did not prohibit licensed hospitals from employing physicians. *Berlin*, 179 Ill. 2d at 7-8, 19, 688 N.E.2d at 108, 114. Nothing in that case leads us to the conclusion that the court intended by implication to hold that the doctrine constitutes a blanket prohibition against nonphysicians enforcing restrictive covenants against physicians.

Nor do we agree with defendants that this case is controlled by *Dr. Allison*. There our supreme court first adopted the corporate practice of medicine (actually dentistry) doctrine, and refused to allow the plaintiff, a corporation, to enforce a restrictive covenant against the defendant, a licensed dentist. Defendants in this case suggest that the *Dr. Allison* court considered and rejected a claim by the corporation that it had an interest in owning and renting "dental parlors" to other individuals, and that we must follow *Dr. Allison* and hold that TLC had no protectable interest in entering into a service agreement with other ophthalmologists.

We disagree with this reading of *Dr. Allison*. In that case the court noted:

> "Although the plaintiff seeks to justify its claim to enforcement upon the ground that it could lawfully own and rent dental parlors to others, it is nevertheless apparent from a reading of the bill that the master's conclusions were entirely correct and that the only damages feared by the plaintiff were in the field of practicing operative dentistry." *Dr. Allison*, 360 Ill. at 640, 196 N.E. at 800.

See also *Dr. Allison*, 360 Ill. at 641, 196 N.E. at 800 ("As above pointed out, the gist of the plaintiff's complaint and its claim to equitable relief is based upon damages alleged to be feared through the defendant's competition in practicing dentistry"). It is readily apparent that the *Dr. Allison* court did not reject the idea that a corporation *could* have a legitimate interest in owning and renting medical facili-

ties. Rather, the court found that in the case before it, the plaintiff's professed interest in owning and renting dental facilities was mere pretext, and the plaintiff's real interest was in precluding the defendant from competing with plaintiff in the practice of dentistry, which was an illegitimate interest because the plaintiff corporation could not practice dentistry.

■ The determination of whether this case is more like *Cleveland Hair* or *Dr. Allison* depends on whether TLC's professed interest in entering into a profitable practice service agreement with ophthalmologists is merely pretextual, a cover for its actual motive of "practicing" excimer laser eye surgery. We do not believe the trial court found TLC's assertion to be a pretext, nor would this have been a proper determination to make at the summary judgment stage. See *DePluzer v. Village of Winnetka*, 265 Ill. App. 3d 1061, 1067-68, 638 N.E.2d 1157, 1161 (1994) ("the issue of an employer's motive or intent is an issue of material fact not subject to summary judgment"); *Carter v. GC Electronics*, 233 Ill. App. 3d 237, 241, 599 N.E.2d 11, 13 (1992) (the issue of motive should not readily be the subject of summary judgment). Accordingly, summary judgment should not have been granted based on the corporate practice of medicine doctrine.

TLC does not make the alternative argument that even if its agreement with defendants did violate the corporate practice of medicine doctrine, defendants should not be allowed to invalidate the contract on that basis. The contention could be made that the doctrine is intended to protect the public, not to allow medical professionals to avoid contractual obligations into which they have voluntarily entered. However, if TLC were to have made such an argument, *Dr. Allison* would provide a sufficient answer. As previously noted, in that case the plaintiff corporation sought to enforce a restrictive covenant against the defendant, a licensed dentist. Our supreme court affirmed the trial court's dismissal of the complaint because of "the inappropriateness of any corporate attempt to practice one of the learned professions ***[;] such a practice is not and cannot be open to commercial exploitation." *Dr. Allison*, 360 Ill. at 642, 196 N.E. at 801. Accordingly, whether or not entering into such a contract might constitute some form of wrongdoing by a physician (or other "learned professional"), it would appear clear that an individual may raise the doctrine as a defense to a corporate entity's attempt to enforce a restrictive covenant.

## II. FEE SPLITTING

Defendants next contend that the judgment may be upheld on the ground that the restrictive covenants are void because the service

agreement contract constituted an illegal fee-splitting arrangement, in violation of section 22 of the Medical Practice Act of 1987 (Medical Practice Act) (225 ILCS 60/22 (West 1994)). Plaintiffs deny that the service agreement violated that statute and argue that defendants should be estopped from suggesting that the agreement is unenforceable after having participated in negotiating and drafting the agreement and having accepted benefits thereunder for nearly an entire year. Plaintiffs also contend that even if the service agreement does violate the statute, the restrictive covenant in the non-competition agreement is enforceable.

■ Section 22 of the Medical Practice Act, entitled "Disciplinary Action," provides in part relevant to this case as follows:

"(A) The Department *** may revoke, suspend, place on probationary status, or take any other disciplinary action as the Department may deem proper with regard to the license or visiting professor permit of any person issued under this Act to practice medicine, or to treat human ailments without the use of drugs and without operative surgery upon any of the following grounds:

\* \* \*

(14) Dividing with anyone other than physicians with whom the licensee practices in a partnership, Professional Association[, limited liability company,] or Medical or Professional Corporation any fee, commission, rebate or other form of compensation for any professional services not actually and personally rendered." 225 ILCS 60/22 (West 1994).

Section 22 of the Medical Practice Act does not only prohibit sharing of fees for patient referrals; Illinois courts have struck down contracts for the sale of a medical practice (see *Lieberman & Kraff v. Desnick*, 244 Ill. App. 3d 341, 614 N.E.2d 379 (1993)) and contracts which involved "performance of some legitimate management services" (see *Practice Management Ltd. v. Schwartz*, 256 Ill. App. 3d 949, 954, 628 N.E.2d 656 (1993)) on the basis that the contracts ran afoul of the statute. The "reach of the statute is not limited to 'fee-splitting.' The Medical Practice Act also prohibits all other fee-sharing arrangements not specifically authorized." *Lieberman & Kraff*, 244 Ill. App. 3d at 345, 614 N.E.2d at 382. The policy reasons behind the prohibition are the danger that such an arrangement might motivate a nonprofessional to recommend a particular professional out of self-interest, rather than the professional's competence. In addition, the judgment of the professional might be compromised, because the awareness that he would have to split fees might make him reluctant to provide proper (but unprofitable) services to a patient, or, conversely, to provide unneeded (but profitable) treatment. *Practice Management*, 256 Ill. App.

3d at 953, 628 N.E.2d at 658, quoting *E&B Marketing Enterprises, Inc. v. Ryan*, 209 Ill. App. 3d 626, 630, 568 N.E.2d 339, 342 (1991).

■ In this case, the service agreement not only provides for reimbursement of TLC for services it renders; TLC is also to receive an additional annual fee. Schedule 6.1 to the service agreement clearly reveals that the amount of the annual fee was determined by defendants' "revenues for year." Although the contract did not structure the annual fee in literal terms of a "percentage" of the practice's revenues *per se*, the fee clearly increased as the revenues increased. There can be no question that under this arrangement plaintiffs were to share in the fees defendants earned. This violated the statute. See *Lieberman & Kraff*, 244 Ill. App. 3d at 345, 614 N.E.2d at 382 (statute prohibits all "fee sharing"). The contract also violated the public policy underlying the statute. Especially considering the fact that by all accounts excimer laser surgery is a wholly elective procedure, and relatively few persons choose to undergo it, the fact that the fees were to be shared with nonphysicians could well exert pressure on the physicians to perform the surgery even if not needed. See *Practice Management*, 256 Ill. App. 3d at 953, 628 N.E.2d at 658, quoting *E&B Marketing*, 209 Ill. App. 3d at 630, 568 N.E.2d at 342.

We cannot concur in plaintiffs' suggestion that because plaintiffs would receive a minimum payment of $200,000, even if defendants' revenues were $0, and a maximum payment of $3 million, no matter by how much defendants' revenues exceeded $10 million, the provision did not constitute feesplitting. There is clearly a direct relation between the revenues generated by the practice and the "fee" defendants were required to pay plaintiffs. The establishment of a floor and ceiling for the yearly fee does not change the character of the relationship. See *Lieberman & Kraff*, 244 Ill. App. 3d at 346-47, 614 N.E.2d at 382-83 (disagreeing with another court's holding that an arrangement in which a group of physicians agreed to pay a corporation 10% of their weekly gross income or $75 per week, whichever was greater, would not violate section 14 of the Medical Practice Act).

Plaintiffs suggest that defendants should not be allowed to void the agreement because they bargained for the agreement and entered into it voluntarily. This argument is not without some intuitive appeal. Although we earlier noted that *Dr. Allison* established that an individual professional could invalidate a restrictive covenant through invocation of the corporate practice of medicine doctrine, the prohibitions against the corporate practice of medicine and against feesplitting are not entirely analogous. Although *corporations* are prohibited from practicing medicine, it is the *physician* who is made subject to discipline by engaging in feesplitting (see 225 ILCS 60/22(A)(14) (West

1994)). Thus the corporation is the wrongdoer in the former context, whereas the physician is the wrongdoer in the latter. It might appear unfair to allow the physicians to benefit (avoid their contractual obligations) as a result of their own wrongdoing (entering into a fee-splitting contract with a nonphysician). *E.g., Nelson v. Araiza*, 69 Ill. 2d 534, 539, 372 N.E.2d 637, 639 (1978) (noting "doctrine that one cannot profit from his own wrong"); *Miller v. Gupta*, 275 Ill. App. 3d 539, 544, 656 N.E.2d 461, 465 (1995) ("[e]quity and fairness will not allow a party to profit from his own wrongdoing"); *Jagielnik v. Board of Trustees of Police Pension Fund*, 271 Ill. App. 3d 869, 878, 649 N.E.2d 527, 533 (1995).

However, it is clear that the feesplitting in the contract in this case violates the Medical Practice Act. Even though the professionals were the ones at fault in entering into the contract, they may raise its invalidity as a defense, as our supreme court held. *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 347-49, 537 N.E.2d 730, 737-38 (1989) (voiding a contract which split fees between an attorney and a nonattorney, rejecting the arguments that (1) the attorneys should be estopped from raising the illegality of a contract which they had drafted and from which they had received benefits and that (2) the attorneys should be bound by the contract because they, rather than the layperson, were the ones at fault in entering into it). The reason for this result is that " '[a] contract expressly prohibited by a valid statute is void. This proposition has no exception, for the law cannot at the same time prohibit a contract and enforce it. The prohibition of the legislature cannot be disregarded by the courts.' " *Duck Island Hunting & Fishing Club v. Edward Gillen Dock, Dredge & Construction Co.*, 330 Ill. 121, 132, 161 N.E. 300, 304 (1928), quoting *DeKam v. City of Streator*, 316 Ill. 123, 129, 146 N.E. 550 (1925). Accord *Swavely v. Freeway Ford Truck Sales, Inc.*, 298 Ill. App. 3d 969, 976, 700 N.E.2d 181, 187 (1998) ("There is no exception to the rule that a contract that violates a valid statute is void, as the law cannot enforce a contract which it prohibits"). Even though it was the physician whose participation in the contract was prohibited, the contract as a whole violates the statute, and the contract as a whole, therefore, is void and unenforceable. *E&B*, 209 Ill. App. 3d at 630, 568 N.E.2d at 342. See also *Duck Island Hunting & Fishing Club*, 330 Ill. at 132, 161 N.E. at 304; *Swavely*, 298 Ill. App. 3d at 976, 700 N.E.2d at 187. Courts have denied even *quantum meruit* recovery for services provided pursuant to contracts which violated the Medical Practice Act prohibition against feesplitting. *Practice Management*, 256 Ill. App. 3d at 955, 628 N.E.2d at 660. We note moreover that the precise argument that a physician should not be allowed to argue that a

contract was invalid because it violated the Medical Practice Act prohibition against fee splitting has already been rejected by the Illinois courts. *E&B*, 209 Ill. App. 3d at 630, 568 N.E.2d at 342 (rejecting argument "because of our conclusion that both the Act and public policy considerations mandate that the contract be declared void"). We reach the same conclusion.

■ Plaintiffs note that the noncompetition agreement also contains a restrictive covenant and contend that, even if the practice service agreement is void because of feesplitting, the covenant in the noncompetition agreement should still be enforced. We disagree. As previously noted, the restrictive covenant in the noncompetition agreement provided that it was not effective "if the Covenantors terminate the Practice Administrative Service Agreement between Covenantors and TLC Midwest pursuant to the terms of Section 8.3 of that Agreement." We have determined that the service agreement is void and unenforceable as a matter of law. It is clear that the parties intended that the restrictive covenant in the noncompetition agreement would be enforceable only if TLC could enforce the service agreement. As it cannot enforce the latter, defendants should not be bound by the former.

Accordingly, we find that the trial court properly granted summary judgment to defendants on count IV of the complaint, in which plaintiffs sought to enjoin defendants from violating the restrictive covenants. This does not, however, resolve the propriety of the court's entry of summary judgment on counts I and II of the complaint, in which plaintiffs requested injunctions under the Anti-Dilution Act (765 ILCS 1035/15 (West 1994)) and the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/1 et seq. (West 1994)).[8]

CONCLUSION

For the reasons above stated, we affirm the circuit court's grant of partial summary judgment to defendants.

Affirmed.

McNULTY and COUSINS, JJ., concur.

---

[8]We also uphold summary judgment in favor of defendants on the Anti-Dilution Act and Uniform Deceptive Trade Practices Act counts. However, because of the page limitations imposed by revised Supreme Court Rule 23, we are compelled to omit our analysis of those issues, as well as the issue of whether the injunctive relief sought was overbroad, from the published portion of our decision. A complete copy of the published and unpublished portions of this decision is on file with the clerk of this court under docket No. 1—98—2648.